951 A.2d 267

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ronald Francis PUKSAR, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 22, 2005.

Decided July 22, 2008.

James H. Moreno, Philadelphia, James Joseph McHugh, Jr., for Ronald Puksar.

Eric E. Winter, Berks County District Attorney's Office, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.*

The instant matter is a collateral capital appeal from the dismissal of appellant's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons stated herein, we affirm the order of the PCRA court.

In April of 1993, appellant Ronald Puksar was charged in connection with the killing of his brother, Thomas Puksar, and his sister-in-law, Donna Puksar. In November of 1993, a jury convicted appellant of first-degree murder for both crimes. The defense at trial focused on the circumstantial nature of

* This matter was reassigned to this author.

the evidence and suggested that Donna Puksar's wounds were self-inflicted, and argued that the killings were a murder-suicide in which appellant was not involved. Following a penalty phase hearing, at which appellant waived the presentation of mitigation evidence, the jury fixed the sentence at life in prison for the murder of Thomas Puksar. However, with respect to the murder of Donna Puksar, the jury found one aggravating circumstance and no mitigating circumstances, and accordingly, fixed the penalty at death as required under 42 Pa.C.S. § 9711(c)(1)(iv).[1] This Court unanimously affirmed the convictions and sentences on November 1, 1999, *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219 (1999), and the United States Supreme Court denied appellant's petition for certiorari on October 2, 2000, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000).[2] Appellant then filed a timely petition for relief under the PCRA on September 17, 2001. Following an evidentiary hearing, the PCRA court dismissed the petition, and this appeal followed.

Appellant raises ten principal issues and numerous sub-issues.[3] We will not review the issues in the order presented by appellant, but instead will first review those issues related to the guilt phase of trial and then review the issues related to the penalty phase. Our standard of review on appeal from the denial of PCRA relief limits us to examining whether the ruling of the PCRA court is supported by the record and free of legal error. *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 798 (2007). Under the PCRA, appellant bears the burden of proving by a preponderance of the evidence that his conviction or sentence resulted from a violation recognized in 42 Pa.C.S. § 9543(a)(2). Appellant must further demonstrate that the issues he pursues have not

1. The jury found that appellant had been convicted of another murder committed either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11).

2. The facts underlying appellant's convictions are set forth in detail in this Court's opinion on direct appeal. Any facts relevant to the issues raised in the instant appeal will be discussed herein.

3. This Court has jurisdiction as we directly review the denial of post-conviction relief in death penalty cases. 42 Pa.C.S. § 9546(d).

been previously litigated or waived. *Id.* § 9543(a)(3). An issue will be deemed previously litigated pursuant to the PCRA if the highest appellate court in which the petitioner was entitled to review as a matter of right has ruled on its merits. *Commonwealth v. Crawley,* 541 Pa. 408, 663 A.2d 676, 678 (1995). A claim will be deemed waived under the PCRA "if the petitioner could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state post conviction proceeding." 42 Pa.C.S. § 9544(b).

■ Appellant first claims that his trial counsel was ineffective for failing to file a pre-trial motion seeking to exclude the testimony of Dr. Isidore Mihalakis, the Commonwealth's expert in forensic pathology, regarding the cause of death of Donna Puksar. In appellant's view, Dr. Mihalakis's testimony was excludable under the test in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), which is followed in Pennsylvania. The *Frye* test governs the trial judge's discretionary judgment in a specific instance: *i.e.,* when there is a challenge to scientific testimony on grounds that it is novel or new. *E.g., Commonwealth v. Dengler,* 586 Pa. 54, 890 A.2d 372, 382 (2005). To understand appellant's claim, a brief review of the relevant background is necessary.

Donna Puksar was shot to death. Before an arrest was made, an investigating Grand Jury was convened. On March 18, 1992, Dr. Mihalakis testified before that Grand Jury and opined that the forensic evidence supported the Commonwealth's theory that Donna was the victim of a homicide based on a reasonable degree of medical certainty. Relevant to this issue, Dr. Mihalakis stated that the evidence indicated that Donna's head and upper torso were turned away from the shooter and that she had her arms up in a blocking effort. He also testified that given the location where Donna's body was found (a small bathroom in the basement of her house), he believed that she was being pursued by the shooter. Additionally, Dr. Mihalakis opined that the evidence suggested that after the first gunshot wound to her jaw, Donna would have been physically unable to fire the second, fatal gunshot to her temple. On February 24, 1993, the Grand Jury returned

indictments, and appellant was subsequently charged with two counts of murder. At trial, Dr. Mihalakis testified consistently with his Grand Jury testimony. Notes of Testimony ("N.T."), 11/1/93, at 57–63, 65.

At trial, the defense vigorously countered Dr. Mihalakis's opinion with expert testimony from its own forensic pathologist, Dr. Cyril Wecht. Dr. Wecht opined that the forensic evidence demonstrated that Donna Puksar had murdered her husband and then committed suicide. As part of that testimony, Dr. Wecht opined that, even after shooting herself once in the jaw, Donna would have been able to deliver the killing shot to her head. As noted in this Court's opinion on direct appeal, in this case involving conflicting theories of experts on the cause of death, the jury apparently rejected the conclusions of Dr. Wecht and accepted those of Dr. Mihalakis when it convicted appellant of the two murders.

On collateral attack, appellant contends that Dr. Mihalakis's Grand Jury testimony should have put trial counsel on notice that his testimony was speculative and that his conclusions were based on guesswork, to the extent that counsel was obliged to do more than secure contradictory expert testimony—as counsel unquestionably did. In appellant's view, trial counsel should have filed a *Frye* motion to have Dr. Mihalakis's forensic opinions outright barred from trial. To support his attack on counsel, appellant presented the opinion testimony of three additional forensic pathologists at the PCRA hearing; these experts testified that Dr. Mihalakis's testimony was based on speculation and not on forensic pathology. Furthermore, the defense PCRA experts disagreed with the conclusions of Dr. Mihalakis and agreed with the conclusions of Dr. Wecht that Donna Puksar had committed suicide. Specifically, Dr. Edward T. McDonough, the Deputy Chief Medical Examiner for Connecticut, opined that Dr. Mihalakis's testimony before the Grand Jury was not based on generally accepted principles of forensic pathology. Dr. McDonough testified that Dr. Mihalakis's hypothesis regarding the circumstances surrounding the murders was "literally a fantastic scenario about what happened to Donna Puksar." N.T., 1/28–

29/04, at 77. Dr. McDonough claimed that the factors relied upon by Dr. Mihalakis in drawing his conclusions were not the type of information that a reasonably competent forensic pathologist would rely upon in formulating opinions. *Id.* at 79–82, 87–88 (testifying that "an attempt to do some sort of scene reconstruction and trying to place Donna Puksar in a position where the initial gunshot wound of the face took place would be appropriate; that would be the appropriate method to do, but to imply that she was cowering, which implies a behavior or an emotional response, is inappropriate"); *id.* at 96–97 (explaining that word "executioner" used by Dr. Mihalakis during his testimony was "wholly inappropriate for an objective observer and somebody to come up with an informed scientific opinion"). Dr. McDonough further suggested that much of Dr. Mihalakis's testimony was speculative. *Id.* at 97–98 (stating that crime scene reconstruction could have been done to support Dr. Mihalakis's testimony that Donna Puksar was shot in temple while lying on floor, but "to my knowledge, it was not done"); *id.* at 101–05 (pointing to statements made by Dr. Mihalakis that were unsupported by physical evidence, such as his suggestion that Donna Puksar was "pursued," that she "realized something was amiss," and that "she was pushed").

Appellant's second PCRA expert, Dr. Albert B. Harper of the Henry C. Lee Institute of Forensic Science, likewise opined that Dr. Mihalakis's expert testimony lacked any indicia of scientific reliability. *Id.* at 133–35. Finally, Dr. Marilyn T. Miller, also of the Henry C. Lee Institute, testified that there was no physical evidence to support Dr. Mihalakis's testimony that Donna Puksar was pursued and that much of Dr. Mihalakis's testimony was speculative and improperly drew conclusions from the lack of physical evidence. *See id.* at 175–76 ("It's clairvoyant."); *id.* at 178–79 (asked about validity of Dr. Mihalakis placing significance on Donna Puksar being dressed in business suit, Dr. Miller opined, "No, of course not. That's crazy. That's ridiculous; no.").

The defense PCRA experts suggested that the methods employed by Dr. Mihalakis in reviewing the crime scene were

not those "generally accepted" by forensic pathologists. From the defense experts' testimony, one can reasonably conclude that a forensic pathologist reviews the physical evidence from the crime scene in order to determine cause of death. The defense experts implied that Dr. Mihalakis did not employ such a method, but rather engaged in speculation and guess-work in reaching his conclusions regarding the cause of Donna Puksar's death. The experts further opined that Dr. Mihalak-is's testimony had no foundation in science, since in their view he selectively ignored physical evidence and only referred to physical evidence that supported his conclusions.

The PCRA court found appellant's claim that counsel was ineffective in failing to seek to preclude Dr. Mihalakis's testi-mony under *Frye* to be unreviewable on previous litigation grounds.[4] Alternatively, the PCRA court concluded that the underlying *Frye* claim lacked merit, since the *Frye* rule ap-plies to novel scientific evidence and using forensic evidence to establish cause of death certainly is not novel. Finally, the PCRA court found that appellant could not establish that the outcome of the proceedings would have been different, since the Commonwealth could have offered the expert opinion testimony of Dr. Halbert Fillinger, who testified for the Commonwealth as a rebuttal witness at trial, in place of Dr. Mihalakis, concerning homicide being the cause of Donna Puksar's death.

We first turn to the PCRA court's suggestion of procedural default on previous litigation grounds. As this Court explained in *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005), collateral claims of trial counsel ineffective-ness deriving from an underlying claim of error that was litigated on direct appeal cannot automatically be dismissed as "previously litigated." Rather, Sixth Amendment claims chal-lenging counsel's conduct at trial are analytically distinct from

4. The PCRA court also found the claim to be waived under *Common-wealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), because it was not properly "layered." This finding plainly is erroneous, as appellant was represented by the same counsel at trial and on direct appeal, and thus there was no need to layer the claim.

the foregone claim of trial court error from which they often derive, and must be analyzed as such. *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 234 (2006) ("This Court recognized in *Collins* that while an ineffectiveness claim may fail for the same reasons that the underlying claim faltered on direct review, the Sixth Amendment basis for ineffectiveness claims technically creates a separate issue for review under the PCRA."). To succeed on a claim of counsel ineffectiveness, of course, the defendant must rebut the presumption of competence and demonstrate both ends of the performance and actual prejudice test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).[5]

In light of this Court's decision in *Collins*, appellant's present claim of ineffectiveness is not previously litigated. The underlying claim raised in appellant's current petition is broader than the claim raised on direct appeal, and the disposition on direct review did not preclude such a broader collateral attack, under the guise of counsel ineffectiveness. On direct appeal, appellant challenged a part of Dr. Mihalakis's testimony on the limited basis that he was not an expert in blood spatter interpretation, and therefore he should not have been permitted to testify to conclusions he drew from the blood spatter found at the crime scene. However, appellant now argues that trial counsel was ineffective for failing to file a pre-trial motion challenging the admissibility of Dr. Mihalakis's expert testimony *in toto* under *Frye*. This claim is sufficiently distinct to survive a previous litigation challenge.

Turning to the merits, the first question is whether there was a basis for counsel to file a *Frye* challenge to preclude Dr. Mihalakis's testimony. Any such global objection to the Commonwealth's expert would have posed a question of

5. To better refine the "counsel performance" part of the *Strickland* analysis in Pennsylvania, this Court considers both the arguable merit of the claim as well as the objective reasonableness of the course taken, or not taken, by counsel. *See Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1076 (2006). Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim. *Id.*

admissibility over which the trial court had discretionary control. *Dengler,* 890 A.2d at 379; *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1046 (2003). The standards governing that discretion are settled. Scientific evidence is admissible under *Frye* so long as the methodology the expert used in reaching his or her conclusions is generally accepted by scientists in the relevant field. *Dengler,* 890 A.2d at 380; *Grady,* 839 A.2d at 1044–45. Of course, "*Frye* is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science." *Dengler,* 890 A.2d at 382; *Grady,* 839 A.2d at 1043–44 (*Frye* test applies only to "novel scientific evidence"). This is so because the purpose of the test is merely to help the court determine when a scientific principle or discovery crosses the line between the experimental and demonstrable stages. *See Frye,* 293 F. at 1014. The *Frye* test was developed specifically to aid courts in determining where in "this twilight zone the evidential force of the principle must be recognized." *Id.*

The *Dengler* Court noted that "[w]hat constitutes novel scientific evidence has historically been decided on a case-by-case basis, and there is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponents proffer may affect the *Frye* determination." *Dengler,* 890 A.2d at 381–82 (collecting and discussing cases where *Frye* has been employed). Furthermore, we have made clear that *Frye* concerns the methodology used by an expert in reaching his or her conclusions; it does not act as a bar upon a qualified expert's conclusions (including minority conclusions), so long as the methodology is generally accepted. *Dengler,* 890 A.2d at 382 n. 6; *Grady,* 839 A.2d at 1045, 1047; *accord Commonwealth v. Whitacre,* 878 A.2d 96, 100 (Pa.Super.2005).

We agree with the PCRA court that there is nothing novel about the general methodology at issue here, *i.e.,* a forensic pathologist using physical evidence found at the

crime scene to opine on the cause of death. Indeed, this sort of expert evidence has been accepted at trial for years, and appellant's own experts, both at trial and in the PCRA hearing, employed the same methodology in reaching their own, contrary conclusions. Appellant insists, however, that the methodology used by Dr. Mihalakis became "novel" because certain of the conclusions he testified to were not derivable from the physical evidence found at the crime scene, but instead, were based on speculation, guesswork, and reliance on non-scientific factors.

Although appellant frames this claim in terms of counsel's failure to file a pre-trial *Frye* challenge, the arguments that appellant now forwards are, as the PCRA court noted, directed primarily at undermining and rebutting the expert testimony of Dr. Mihalakis. For example, appellant challenges Dr. Mihalakis's testimony that Donna Puksar was shot while falling down or lying down. Appellant points to Dr. Miller's testimony at the PCRA hearing opining that Dr. Mihalakis's conclusion is impossible. N.T., 1/28–29/04, at 175.

In essence, the instant *Frye* ineffectiveness claim is a challenge to the defense strategy that counsel actually pursued at trial. As noted previously, in his defense, appellant offered the expert testimony of Dr. Wecht, who countered much of Dr. Mihalakis's testimony by testifying that the forensic evidence supported his own conclusion that Donna Puksar committed suicide. Furthermore, on more than one occasion, Dr. Wecht specifically challenged Dr. Mihalakis's testimony by suggesting that it was based on "speculation" rather than the evidence. *See, e.g.,* N.T., 11/3/93, at 28–29 ("I don't understand what Dr. Mihalakis is saying.... I just don't follow [his] reasoning."); *id.* at 33 ("I find no evidence of [cowering] whatsoever. I can't even speculate for a moment."); *id.* at 34 ("I do not understand how in this case one could arrive at that kind of an opinion one way or the other. I'm not saying she might not have been, but I am saying I don't see any evidence that she was."); *id.* at 39 ("I don't understand how anybody could speculate about that in relationship to what we know about neuroanatomy and neurophysiology that that wound

produced unconsciousness or would have disabled. I don't understand that at all."). Trial counsel obviously appreciated the difficulty presented to the defense by Dr. Mihalakis's testimony, as well as the weaknesses in that testimony. Counsel met the difficulty head-on, by presenting his own, well-respected expert, who offered both a different conclusion, as well as a criticism of the legitimacy of Dr. Mihalakis's conclusions.

The expert testimony offered at trial by both sides amounted to a battle of the experts, with the jury as the ultimate referee based upon its assessment of the credibility of the experts. As made clear in *Dengler* and *Grady*, however, *Frye* does not operate to bar disputed conclusions of an expert, so long as the methodology employed is not novel. *See Grady*, 839 A.2d at 1045 ("[I]n applying the *Frye* rule, we have required and continue to require that the proponent of the evidence prove that the **methodology** an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial. This does **not** mean, however, that the proponent must prove that the scientific community has also generally accepted the expert's **conclusion**.") (emphasis added) (citation omitted); *Dengler*, 890 A.2d at 382 n. 6. Thus, to the extent appellant is merely attempting to revisit the plausibility of Dr. Mihalakis's expert opinions, the jury, as fact-finder, has made this determination.

As for his methodology, Dr. Mihalakis's opinions derived from his review of the physical evidence at the crime scene. N.T., 11/1/93, at 4–7 (explaining materials Dr. Mihalakis reviewed in preparing his testimony, including visiting crime scene, examining weapon, examining victims' clothes, and reviewing various laboratory reports). As explained by appellant's own PCRA expert, a review of the physical evidence is not a novel way to reach a conclusion about cause of death. Rather, this is precisely the role of a forensic pathologist. N.T., 1/28–29/04, at 172. We do not believe that counsel acted in an objectively unreasonable manner by responding as he did, rather than concluding that *Frye* exclusion principles

were implicated, requiring him to seek to bar the testimony, or certain parts of it, outright, as "junk science."

To be sure, appellant's experts disagreed with the physical evidence that Dr. Mihalakis relied upon, the weight he placed on some crime scene evidence to the exclusion of other evidence, and the conclusions he drew from that evidence. Of course, we do not dispute that, in an instance where a party believes that the opposing party's experts have so far strayed from an accepted methodology, an advocate may believe that a *Frye* challenge should be leveled—either to exclude the expert entirely, or to narrow the scope of the valid testimony. However, the question we face in this collateral attack is not whether such an objection could be leveled via *Frye*, but it is whether counsel's conduct in the face of the Commonwealth's expert testifying was such that he must be deemed ineffective for failing to pursue that course, as opposed to the course he did pursue. *See, e.g., Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 460 (2004) (noting that, under *Strickland*, this Court requires defendant to prove not only that counsel arguably should have chosen path not taken, but also that path counsel did take was objectively unreasonable). Mindful of the deference to counsel commanded by *Strickland*, we cannot find counsel ineffective for failing to seek to extend *Frye*.

Appellant's next argument is that trial counsel was ineffective for failing to obtain and present substantial and compelling evidence contradicting the Commonwealth's theory of the case. The first aspect of this evidence relates to the alleged stormy relationship between Thomas and Donna Puksar. Appellant offers that three people, Robert Wofse, Beverly Hall, and Margaret Puksar, could have testified to the couple's strained relationship. Appellant says this testimony would have been consistent with the defense theory of the case.

"Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Com-*

*monwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 517 (2002) (internal quotation marks omitted). A claim of ineffectiveness cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued. *Id.* Additionally, in order to establish that counsel was ineffective for failing to call a particular witness, the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 599 (2007).

At trial, appellant presented Donna Puksar's diary as evidence in support of a defense theory that there was tension in Donna and Thomas Puksar's relationship, that she was depressed about the state of their relationship, and thus, supposedly, Donna had a motive to murder her husband and kill herself. N.T., 11/4/99, at 15–22. Appellant also presented the testimony of Bridgette Alexander in an attempt to demonstrate marital tension. During summation, appellant's trial counsel referenced Donna's words from her diary in arguing the defense theory of murder-suicide. Appellant now argues that counsel was ineffective in failing to present additional testimonial evidence to support this defense theory.

Turning first to Mr. Wofse, appellant offers that Wofse could have testified that appellant described to him part of a phone conversation he recently had with his brother Thomas, wherein Thomas said that Donna had attempted suicide. Appellant argues that Wofse was willing to testify to the hearsay and that such testimony would have been admissible, either to establish Donna's state of mind, or under the exited utterance exception to the hearsay rule.

The Commonwealth responds that it is impossible to know what trial counsel did or did not know regarding Mr. Wofse, since appellant failed to question trial counsel about Wofse during the PCRA hearing. Moreover, the Commonwealth asserts that Wofse's testimony would have been excluded as

triple hearsay under Pa.R.E. 802. The Commonwealth also asserts that this proffer is completely uncorroborated as no phone records were produced to show that appellant and his brother actually had a phone conversation during the relevant period.

The PCRA court concluded that this claim lacked arguable merit because Wofse's testimony would have been inadmissible under Pa.R.E. 802. Moreover, the court noted that this testimony could have opened the door to other unfavorable evidence. The PCRA court also pointed out that appellant never asked trial counsel if he had a strategy for not calling this witness. Finally, the court concluded that appellant did not establish that he was prejudiced by counsel's conduct, since evidence of marital discord was actually presented at trial. PCRA Ct. Op., 11/16/04, at 9.

The Commonwealth and the PCRA court are correct that PCRA counsel failed to question trial counsel regarding Wofse during the PCRA hearing. Although Wofse claimed he had spoken with trial counsel's investigator, appellant never attempted to establish what trial counsel knew—*i.e.*, if he knew of the existence of the witness and what the witness supposedly would have said. Just as importantly, as the PCRA court observed, appellant failed to ask trial counsel if he had a strategy or reason for not calling this witness. And, finally, appellant has not demonstrated how Wofse's testimony, which purported to relate **hearsay from appellant's mouth,** would have been admissible. Appellant has failed to prove the merit in this claim, much less that counsel lacked a reasonable basis for his supposed dereliction.

Turning to Beverly Hall, a co-worker of Donna Puksar, appellant alleges that Hall would have testified that Donna told her about an incident involving Thomas and another woman, which made Donna question Thomas's fidelity to her. Appellant argues that this hearsay testimony would have been admissible under the state of mind exception to the hearsay rule.

The Commonwealth counters that these statements were not admissible under any hearsay exception. Furthermore, the Commonwealth argues that Hall's credibility is poor, since appellant failed to establish that Donna and Hall were anything other than long-term co-workers. The Commonwealth also points out that Donna's concerns regarding the other woman were actually developed for the jury by the admission of the contents of her diary, which was uncontested by the Commonwealth.

The PCRA court rejected this ineffectiveness claim because Hall's testimony constituted inadmissible hearsay and, furthermore, appellant failed to establish prejudice, since the evidence was already presented to the jury, in the victim's own words, when her diary was read to the jury during trial, and by trial counsel during closing arguments. PCRA Ct. Op., 9/8/04, at 7.

Hall's proposed testimony was at best cumulative of evidence of a substantially similar nature that was read into evidence from Donna's diary. At the PCRA hearing, when trial counsel was asked whether live hearsay testimony was preferable to a written document, he responded, "[i]t can be and it can't be. You know a live person can be cross-examined; a document can't be, so you're getting into tactics. Sometimes yes; sometimes no." N.T., 11/26/03, at 99. Additionally, at the PCRA hearing, the Commonwealth cross-examined trial counsel with information that Hall had told the investigating police officer that "[Donna] loved [Tom] a lot, and would not want to live without him." *See id.;* Commonwealth's Exhibit No. 2. When the Commonwealth asked trial counsel whether he would have wanted this type of testimony elicited from a defense witness, he unequivocally replied, "I would not have wanted that testimony to be presented." *Id.* at 93.[6]

6. Trial counsel reiterated this view later in his testimony when he was again asked about presenting Hall's testimony in light of the fact that Hall had stated that she would be surprised if Donna had shot Thomas because she loved him. Counsel stated:

That's what you had asked earlier, and of course, the answer is no, in anticipation of cross-examination. Had I known that, of course, I

In his argument before this Court, appellant does not attempt to address this aspect of trial counsel's testimony, focusing instead on what Hall could have said regarding the nature of the supposedly strained relationship between Donna and Thomas Puksar. Even assuming the evidence could survive a hearsay challenge, it is clear from trial counsel's testimony that he had a strategic reason for not presenting Hall. Appellant, who ignores counsel's explanation, has not met his burden of rebutting the presumption that counsel's strategic decisions were reasonable.

Appellant also argues that Margaret Puksar, mother of appellant and Thomas, should have been called to testify to the tension between Donna and Thomas Puksar. Specifically, Mrs. Puksar had told the defense investigator that, in 1991, she had received a birthday card signed by Thomas, but not by Donna; that on Easter Sunday 1991, Donna and Thomas did not sit near each other and that they got into an argument over Thomas's former father-in-law moving in with them; and that on New Years' Eve 1990–91, Donna threw a cocktail glass at a portrait of Thomas and herself.

The Commonwealth responds that this testimony was not helpful, since these events occurred at a time well before the murders. According to the Commonwealth, Mrs. Puksar had no contact with the victims in the weeks or days before the murders. Furthermore, the record reveals trial counsel's reasons for not presenting this testimony. Specifically, during the penalty phase of the trial, trial counsel stated that neither of appellant's parents was in a physical or mental condition to testify at the penalty phase. Counsel reiterated this point at the PCRA hearing. Although Mrs. Puksar disputed counsel on this point at the PCRA hearing, it was for the PCRA court

would not. If it became relevant, if it was an admissible question, if all the evidentiary questions had been answer [sic] in my mind, yes, then, of course, I would not have opened up that door, because as we had it, we had nothing between Ron Puksar and Thomas Puksar that would give a jury an inclination that there was anything bad going on, and really, all that we had was that there was not a good relationship between Donna and Tom, and I would never have opened the door to allow that to come in intentionally.

*Id.* at 103–04.

to determine if trial counsel's testimony was more credible. Finally, the Commonwealth raises concerns that Mrs. Puksar's testimony could have opened the door to other, much more damning testimony.

The PCRA court found that appellant did not establish that Mrs. Puksar was available to testify since she was in poor health at the time of trial. Furthermore, the PCRA court agreed that Mrs. Puksar's testimony might have opened doors that counsel would have preferred remained closed. For these reasons, the PCRA court concluded both that this claim was without merit and that trial counsel had a reasonable basis for not calling Mrs. Puksar at trial.

The PCRA court's findings are supported by the record. At the PCRA hearing, counsel explained that Mrs. Puksar was not in good mental health during the trial. Counsel also stated that his discussions with Mrs. Puksar during this time revealed that she did not want to testify. Finally, counsel said he would have presented her testimony only in the penalty phase, but not at the guilt phase. Counsel's representation was consistent with his statements during the trial indicating that appellant's parents were in ill health. N.T., 11/8/93, at 1032–33. Moreover, the PCRA court credited counsel's testimony. On this record, appellant has failed to establish that Mrs. Puksar was available to testify at the guilt phase of appellant's trial, and thus counsel cannot be deemed ineffective for failing to call her.

In a related claim, appellant argues that trial counsel should have offered the testimony of various witnesses to demonstrate that appellant and his brother in fact were not in a dispute at the time of the murders. The dispute to which appellant refers relates to the Commonwealth's evidence of motive, which indicated that appellant and his brother were involved in a long-term disagreement over model trains to which they both claimed ownership. In support of his present position, appellant asserts that Mrs. Puksar should have been called to testify that appellant and his brother were "very close friends." Appellant also argues that Lew Warden, ap-

pellant's attorney in a civil matter in California, should have been called to testify that Thomas had told him that appellant had given him the train collection in full payment of his debt and he considered the debt paid in full.

Appellant's argument ignores that trial counsel had successfully excluded a significant amount of damaging evidence regarding the nature of the brothers' relationship from trial via a pre-trial motion *in limine*. Specifically, as the PCRA court noted, trial counsel had successfully managed to have excluded evidence that Thomas had stated that he no longer had a brother and that Donna and Thomas had changed the security code to their house because they were afraid of appellant. Trial counsel noted that the last thing he wanted to do was jeopardize that ruling by eliciting dubious testimony from Mrs. Puksar and Attorney Warden that appellant and Thomas supposedly enjoyed a good relationship, thereby opening the door to the excluded, contrary evidence. *See* N.T., 11/26/03, at 96. Because counsel's strategy was reasonably based, this argument fails.

Appellant also argues that counsel was ineffective for failing to present two other pieces of information. The first accusation involves information relevant to the fact that, at trial, the Commonwealth presented evidence that appellant's fingerprints were found on a box of bullets in the victims' home. Appellant asserts that Mrs. Puksar could have testified that she had asked appellant to bring milk crates to Thomas and Donna's home that were filled with Thomas's things and that these milk crates had boxes of bullets in them, thereby presenting an innocent explanation for the presence of appellant's fingerprints. As we have explained above, counsel offered sufficient explanation of his reasonable grounds for failing to call Mrs. Puksar during the guilt phase and we need not delve into this question anew.

The second piece of information appellant argues that trial counsel should have presented was testimony that Donna had some familiarity with guns. Appellant asserts that this testimony would have rebutted the prosecutor's argument at

closing that there was "no evidence of [Donna's] familiarity with any weapon." N.T., 11/8/93, at 963. However, it is well-settled that arguments of counsel are not evidence and the jury was so instructed in this case. *Id.* at 1464. Accordingly, there was no reason for trial counsel to anticipate and rebut counsel's argument in this regard with testimonial evidence. Furthermore, appellant has not proven prejudice arising from this minor point.

Appellant separately argues that trial counsel was ineffective for failing to investigate and present character witnesses to testify to appellant's supposed good reputation for being a peaceful, honest, and law-abiding citizen. Appellant offers that such testimony would have constituted substantive evidence of his innocence of the murder charges.[7]

At the PCRA hearing, however, the only potential character witness produced was Mrs. Puksar. While character witnesses may not be impeached with specific acts of misconduct, a character witness may be cross-examined regarding his or her knowledge of particular acts of misconduct to test the accuracy of the testimony. *See Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1069 (2002). As addressed previously, counsel had successfully secured exclusion of substantial evidence regarding the true nature of the relationship between appellant and Thomas and, trial counsel testified, he did not want to risk introduction of that evidence through the back door. Appellant has failed to establish that counsel lacked a reasonable basis for failing to call Mrs. Puksar to the stand to testify to the defendant's alleged "good" character. In addition, as noted above, counsel had a reasonable reason for not wanting to call Mrs. Puksar at all.

Appellant's next three arguments relate to alleged violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable

---

7. We should note that evidence of one's reputation for honesty would have been irrelevant in a murder prosecution, since murder does not implicate the character trait of honesty.

to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and the obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Furthermore, under *Brady*, the evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth v. (James) Lambert*, 584 Pa.461, 884 A.2d 848, 854 (2005) (quoting *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

 Appellant's first alleged *Brady* violation involves James Bucci, the former acting District Attorney of Berks County. Bucci testified at the PCRA hearing that, at some point during the investigation in this case, he spoke to an FBI agent who told him that the absence of fingerprints on the murder weapon did not necessarily mean that it had been wiped clean. Appellant notes that such information was contrary to the prosecutor's closing argument wherein he claimed that the evidence showed that the gun was wiped clean. Appellant then argues that the Commonwealth committed a *Brady* violation in failing to turn this evidence over to him.

In response, the Commonwealth asserts that this evidence is no more than opinion evidence from a "phantom FBI fingerprint expert." The Commonwealth points out that there is nothing to show who this expert was, what his qualifications were, what the expert's methods or familiarity with the evidence was, or if the expert would have been willing to testify at trial. In the Commonwealth's view, there is nothing to suggest that this proposed testimony was based on anything but speculation. The Commonwealth also focuses on the fact that contrary evidence regarding the fingerprint evidence was

presented at trial. Thus, the Commonwealth asserts that appellant cannot demonstrate that the result of the proceeding would have been any different, if only the hearsay opinion had been disclosed.

The PCRA court followed the Commonwealth's logic, pointing out that appellant failed to present any evidence in support of his claim at the PCRA hearing besides Mr. Bucci's testimony. Furthermore, the court concluded that the claim failed since testimony was presented regarding the significance, or lack thereof, concerning fingerprints on the murder weapon at trial.

We see no error in the PCRA court's ruling. Appellant has not established prejudice from the absence of this vague and essentially cumulative information. Indeed, at trial, the defense presented expert testimony substantially similar to the opinion offered to Bucci by the FBI agent: appellant's expert testified that the lack of fingerprints did not necessarily suggest that the gun was wiped clean. N.T., 11/2/93, at 42. In rebuttal, the Commonwealth presented evidence that the lack of fingerprints on the gun could indicate that it had been wiped clean or that some type of protective glove was worn. N.T., 11/5/93, at 1406–07. Appellant fails to account for the fact that the jury heard the contrary evidence regarding the significance, or lack thereof, of fingerprint evidence at trial in his argument before this Court. Accordingly, appellant's first *Brady* claim fails.

Appellant's second claimed *Brady* violation relates to an alleged report of Dr. Henry Lee interpreting the blood spatter at the crime scene. Appellant declares that the Commonwealth "knowingly withheld" the opinion of Dr. Lee. However, there is nothing to suggest that Dr. Lee ever gave the Commonwealth an opinion regarding blood spatter or any other point in issue.

The PCRA court afforded appellant an opportunity to present evidence in support of this claim. Appellant presented evidence only that Dr. Lee was contacted by the Pennsylvania State Police and that the State Police authorized funding for

the retention of Dr. Lee. Appellant never demonstrated that there was an actual report prepared by Dr. Lee nor did he offer the testimony (or even an affidavit) of Dr. Lee in support of his claim. In the absence of any evidence that a report was actually prepared by Dr. Lee, there is no basis for a claimed *Brady* violation and the PCRA court correctly dismissed this issue.

Finally, appellant contends that the prosecutor in this case withheld exculpatory evidence that Dr. Mihalakis had changed his testimony in another case, *Commonwealth v. (Lisa) Lambert* (a Lancaster County murder prosecution occurring in July of 1992), after the Lancaster County prosecutor intimated that Dr. Mihalakis might lose business in Lancaster County if he testified favorably for the defense. The *Lambert* case that appellant refers to gained notoriety when Judge Stewart Dalzell, of the federal district court, sitting in habeas review of a separate Pennsylvania murder conviction, granted Lambert habeas corpus relief on alleged *Brady* claims, including a claim that the prosecutor committed a *Brady* violation in contacting Dr. Mihalakis about his proposed defense testimony. *See Lambert v. Blackwell*, 962 F.Supp. 1521 (E.D.Pa.1997). Judge Dalzell did so even though those claims had never been exhausted in state court (which meant the petition should have been dismissed on non-exhaustion grounds). The defense evidence at the federal proceeding suggested that Dr. Mihalakis was contacted by the Lancaster County prosecutor, threatened with the potential loss of business if he testified for the defense, and changed his testimony based on the contact with the prosecutor. Appellant argues that the information reported in Judge Dalzell's opinion was relevant to confront the objectivity and reliability of Dr. Mihalakis's testimony in all cases and could have changed the outcome of his trial.

The Commonwealth responds that appellant has cited no case law or statute requiring one county to turn over information to another county regarding a completely unrelated case.

The PCRA court found that this issue was waived, as appellant did not develop his claim as one of ineffective

assistance of counsel. The PCRA court's cursory analysis misses its mark. Placing aside the merits for purposes of assessing PCRA cognizability, *Brady* claims do not need to be presented in terms of ineffectiveness, since the essence of the claim is that the appellant **was not informed** of certain exculpatory information because it was **withheld** from him by a government agency with a constitutional duty to disclose. Some *Brady* claims, of course, can be available at trial and defaulted; but if the claim is based upon *Brady* material about which the defense knew nothing, the claim is cognizable, on its own, under the PCRA. Nevertheless, appellant is not entitled to relief on the merits of this claim, which he has presented in a disingenuous fashion.

We are troubled by appellant's less than candid presentation of this claim. Appellant neglects to mention that Judge Dalzell's initial decision was vacated by the Third Circuit due to Lambert's failure to exhaust state remedies as to some of her claims, including the *Brady* claim. *Lambert v. Blackwell,* 134 F.3d 506 (3d Cir.1997), *cert. denied,* 532 U.S. 919, 121 S.Ct. 1353, 149 L.Ed.2d 284 (2001). Lambert's case then returned to the state system, Lambert was denied relief on this claim under the PCRA, and that decision was affirmed by the Superior Court. Lambert then returned to federal court in 2001 and, after Judge Dalzell eventually recused himself, the Honorable Anita Brody of the Eastern District ultimately determined that the PCRA court's rulings were entitled to deference on federal habeas review. The Third Circuit affirmed that decision, agreeing that Lambert did not demonstrate that the allegedly improper contact substantially interfered with Dr. Mihalakis's testimony or affected his decision to testify. *Lambert v. Blackwell,* 387 F.3d 210, 263–64 (3d Cir.2004).[8]

Most disconcerting about appellant's argument to this Court is that this subsequent case history was available at the

---

8. While the Third Circuit felt that the District Attorney's contact with Dr. Mihalakis was not entirely appropriate, it agreed with the PCRA court's findings that his trial testimony was consistent with the reports he had prepared before trial and that there was no element of surprise involved in the case. *Id.*

time he filed his brief in this Court, yet he completely ignores it in favor of the vacated ruminations of the initial federal judge concerning a claim not then exhausted in the Pennsylvania state court system. Moreover, there is nothing suggesting that any undisclosed improper conduct occurred in this case or that the conduct in the *Lambert* case had any effect on Dr. Mihalakis's testimony in this case. The obligation to turn over exculpatory evidence is limited to that information in the possession of the same government agency bringing the prosecution. *See Kyles, supra.* Accordingly, this final *Brady* claim is patently meritless.

Appellant's final issue related to the guilt phase of trial is that he is entitled to a new trial because of the cumulative effect of alleged persistent "prosecutorial misconduct." Appellant premises his claim on two basic notions: first, that the prosecutor falsely argued to the jury that the reason there were no fingerprints on the gun was because it had been wiped clean; and second, that the prosecutor falsely argued to the jury that there was no evidence that Donna Puksar had any familiarity with guns. In both instances, appellant contends that the prosecutor knew that his arguments were untruthful, since he had contrary information in his possession.

Appellant's arguments fail. Not only does he merely rehash arguments previously made, discussed, and dismissed above, but also these complaints fail because they are reviewable only under the rubric of ineffective assistance of counsel, and appellant has utterly failed to develop them in terms of the *Strickland/Pierce* test. *See* 42 Pa.C.S. § 9544(b); *Rios,* 920 A.2d at 800. Absent explanatory, relevant argument, the merit in these complaints is not apparent. It is not "misconduct" to advocate a point, even a point one's opponent would dispute or would have preferred not to be argued.

Having concluded that appellant's guilt phase claims do not entitle him to relief, we now turn to the penalty phase. Three of appellant's penalty phase issues relate to counsel's alleged failure to conduct an appropriate investigation into potential mitigating evidence. In brief, appellant claims that trial coun-

sel was ineffective for permitting him to waive the presentation of mitigating evidence without a mental health evaluation, that trial counsel did not conduct an adequate investigation into potential mitigating evidence, and that counsel essentially abandoned him with regard to the presentation of mitigating evidence. We will begin by reviewing the relevant testimony presented at the PCRA hearing as the same testimony provides the basis for these three complaints.

Appellant first presented the testimony of Attorney John Boccabella, who was initially retained by appellant in April of 1991 and prepared appellant for his appearance before the Grand Jury. During this time, Boccabella became acquainted with appellant's lawyer in California, Lew Warden. In letters to Boccabella, Attorney Warden raised concerns that appellant was suffering from a "severe mental disorder" [9] and forwarded Boccabella records of psychiatric and psychological evaluations that were performed on appellant in California (hereinafter the "Sierra Clinic records"). As a result of his communications with Warden, Boccabella retained Dr. Larry Rotenberg, a forensic psychiatrist, to evaluate appellant. This information, including Warden's letters, was forwarded to trial counsel, Attorney Alan Sodomsky, as part of appellant's file. Boccabella also stated that appellant was not able to follow his simple instructions when he testified before the Grand Jury. N.T., 11/25/03, at 55–59.

Warden testified at the PCRA hearing, stating that he had represented appellant between 1982 and 1991. Warden also verified an affidavit that was submitted to the PCRA court. In that affidavit, Warden offered that during the course of his representation, appellant's depression deepened. Warden believed that, at some point during his representation, appellant crossed the line between reality and delusion because he had misled many of the experts as to his life history. He also believed that appellant was not competent to assist him in his

9. Specifically, Warden referred to appellant as "undoubtedly mentally ill," "deranged," "unquestionably a paranoid schizophrenic," and "mentally or emotionally incompetent to act in his own best interests" in his letters to Attorney Boccabella.

civil litigation since appellant could no longer perceive his best legal interests, yet appellant refused to seek psychiatric care. Finally, Warden stated that he wrote to Boccabella "explaining [appellant's] serious mental health problems and the fact that [he] did not believe at that time that [appellant] was legally competent and was in serious need of mental health treatment." Affidavit of Lew Warden, Defendant's Exhibit No. 36. At the PCRA hearing, Warden testified that he wrote a letter to Dr. Rotenberg informing him that appellant had misled Dr. Rotenberg during his mental examination, including that appellant had concealed prior mental health tests and evaluations he had received, and that appellant had a long history of misrepresenting his educational background and his military experience to investigators. N.T., 1/26/04, at 222.

In further support of his claims, appellant presented the testimony of two mental health experts. The first was Dr. Rotenberg, who was retained by Boccabella to evaluate appellant in 1991. At that time, Dr. Rotenberg diagnosed appellant with Axis I—adjustment disorder with mixed depressed and anxious moods, and personality disorder, not otherwise specified. Dr. Rotenberg further testified that he received more information after the initial evaluation, but he never did anything further with appellant's file because he was never contacted by anyone until he was contacted by PCRA defense counsel to prepare a follow-up report. N.T., 1/29/04, at 195–98.

Dr. Rotenberg testified that, after reviewing the Sierra Clinic records, he believed appellant was suffering from a personality disorder, "which was that of really under the best of times not having a terribly good contact with reality, caused him at [the time of trial] to have an even more impaired contact with reality." Dr. Rotenberg also opined that appellant would not have been able to assist counsel during the penalty phase of his trial because of his personality style. *Id.* at 199–200.

On cross-examination, Dr. Rotenberg stated that he believed appellant was competent to stand trial, but not to waive the presentation of mitigating evidence. Dr. Rotenberg's

opinion in this regard was based on his belief that appellant's competence became an issue only after he was found guilty, since he would have "given up on the system" at that point. Specifically, Dr. Rotenberg stated: "When he was found guilty he was so angry and so enraged that he essentially gave up on the system, and given his tendency to become depressed, to become anxious together with his tendency to say, in essence, to hell with it all, the world is not the way I want it to be, and therefore, I'm not going to participate, it was at that point that he became, in my opinion, as a result of many narcissistic issues within his personality, incompetent to say I'm giving up, I'm not participating, do your will." Dr. Rotenberg insisted that, no matter how rational and logical appellant appeared during the waiver of mitigation colloquy, the colloquy would have been "infected by the impairment" he detected in appellant. Dr. Rotenberg admitted that he only saw appellant one time for about an hour in May, 1991, that he did not do any independent psychological testing, and that the only psychological testing that was done was completed four years prior to his seeing appellant. *Id.* at 203–09.

Appellant also presented the testimony of Dr. Neil Blumberg, a psychiatrist with a subspecialty in forensic psychiatry. After enumerating the records he had reviewed in preparing his report, Dr. Blumberg opined that appellant's history raised serious questions about his ability to assist in his defense at sentencing. Dr. Blumberg testified that he interviewed appellant for a little under eight hours and conducted some psychological and neuropsychological tests. The results of those tests led Dr. Blumberg to believe that appellant was suffering from depressive disorder and, based on the Sierra Clinic records, he had been suffering from such a disorder since the mid–1980s. Dr. Blumberg also opined that appellant suffered from a personality disorder that made him lie about his life history to the point of being delusional, "[t]hat is at times his—he becomes—he becomes so convinced of these, I guess, fabrications that he has made up about his background that he appears to believe it and live it out." N.T., 1/28/04, at 31. Dr.

Blumberg concluded that appellant was a pathological liar. *Id.* at 32.

On cross-examination, Dr. Blumberg opined that, during the waiver of mitigation evidence colloquy, appellant "clearly understood" what was going on, "but was hoping to self destruct and be executed.... His choice not to assist was one, in my opinion, that was definitely impacted on [sic] by his depression, by his personality disorder...." *Id.* at 42–43. Dr. Blumberg acknowledged the length of time that had passed between the Sierra Clinic evaluations and Dr. Rotenberg's opinion (six years) and the further time lapse by trial (two years), but said he believed the information was still relevant in forming his opinion. He also acknowledged that, well in advance of trial, appellant had maintained that he "likely did not want" to present mitigating evidence. Dr. Blumberg opined that the trial court and Attorney Sodomsky were incorrect in believing appellant to be competent at the time of the mitigation waiver colloquy. Finally, returning to the competency standard, Dr. Blumberg offered his opinion that appellant understood the nature and object of the proceeding, but stated a belief that his incompetence had to do with his depression and personality disorder, which prevented appellant from rationally participating in his defense. Like Dr. Rotenberg, Dr. Blumberg pinpointed the time of incompetence as arising abruptly, *i.e.*, after appellant was convicted of first-degree murder. *Id.* at 44–52.

Finally, appellant presented the testimony of Attorney Sodomsky. Sodomsky testified that he vaguely remembered receiving the Sierra Clinic records and knowing that Dr. Rotenberg had evaluated appellant. He also stated that he did not have any contact with a mental health expert related to the penalty phase and never had appellant evaluated specifically for purposes of the penalty phase. Sodomsky had, however, retained a Dr. Michaels for the guilt phase to testify regarding the Puksars' relationship and Dr. Michaels was available to him generally. Sodomsky testified that he did not call anyone regarding the Sierra Clinic records and did not give those records to Dr. Michaels or anyone else to evaluate. Last,

Sodomsky recalled discussing potential mitigating evidence with appellant, including that he wanted to put into evidence that appellant did not have a prior record and wanted to have his mother testify, but he did not recall ever discussing whether the Sierra Clinic records could be used as potential mitigating evidence. N.T., 11/26/03, at 82–87.

On cross-examination, Sodomsky testified regarding the point at which appellant made clear that he did not want to present any mitigating evidence. Sodomsky also recalled his meetings with appellant prior to trial, during which he never questioned appellant's competency, as follows:

Q: Did you ever have any indication that he was not able to communicate with you or enable you in preparing his defense?

A: Mr. Puksar was one of the more intelligent individuals that I represented over the years that I've practiced criminal defense. He was very adamant in his position, very intelligent, and I enjoyed my conversations with him. I enjoyed getting to know him. He was actually a pleasant individual. I never had any indication whatsoever that he wasn't understanding what was being said or that he had any mental deficiency whatsoever.

*Id.* at 94.

Appellant's first argument regarding mitigating evidence involves whether trial counsel was ineffective for ignoring evidence of appellant's mental health disorders and failing to have appellant evaluated prior to his waiver of mitigating evidence at the penalty phase. Appellant contends that this claim has arguable merit, since Attorney Sodomsky had evidence of appellant's history of mental illness and information that he had been unable to assist his civil attorney concerning ongoing litigation in California between 1982 and 1992. Appellant argues that his then-mental state rendered the waiver not knowing and voluntary. Sodomsky compounded his error at the waiver colloquy itself, appellant says, when he told the trial court that there was "absolutely no doubt in my mind that this is a knowing, and voluntary decision." N.T.,

11/10/93, at 1031. Appellant also asserts that counsel had no reasonable strategy for failing to have appellant evaluated in light of the information he had about appellant's mental history and he certainly had no reason for not attempting to contact Attorney Warden or Dr. Rotenberg. Finally, appellant asserts that he was prejudiced by counsel's actions, since even a cursory mental health investigation would have revealed appellant's incompetency to waive mitigation evidence. At the very least, appellant asserts, trial counsel should have informed the court of appellant's mental health history so the court could have ordered a mental health evaluation.

The Commonwealth responds that the testimony of both of appellant's experts was unreliable. The Commonwealth points to the substantial gap in time between the trial and Dr. Blumberg's evaluation as well as the minimal amount of information that Dr. Rotenberg had available to him in making his assessment. The Commonwealth also asserts that the experts' opinions were inconsistent with each other, since Dr. Blumberg believed appellant suffered from depressive and personality disorders whereas Dr. Rotenberg diagnosed appellant with only a personality disorder. Respecting Dr. Rotenberg's opinion on appellant's competency, the Commonwealth questions the standard for competency employed by the doctor. The Commonwealth offers that the better measure of appellant's mental state may be found in those who observed appellant during the relevant time, *i.e.*, the testimony of Attorney Sodomsky and the observations of the trial court. The Commonwealth points out that testimony of lay witnesses may sufficiently establish the competency of the accused even when there is expert testimony to the contrary. *See Commonwealth v. Smith*, 322 Pa.Super. 504, 469 A.2d 1104, 1108 (1983) (relying in relevant part on *Commonwealth v. Zlatovich*, 440 Pa. 388, 269 A.2d 469 (1970)).

The PCRA court reviewed appellant's contentions and concluded that they were without merit. In its opinion, the court noted that trial counsel was familiar with appellant and was in a position to perceive whether appellant had any mental health issues including whether he had the ability to comprehend the

proceedings. "Further, this court had ample opportunity to observe the defendant during the period at issue and there was no indication that mental health evaluations were necessary." PCRA Ct. Op., 9/8/04, at 9–10.

This Court has held that a capital defendant may waive mitigation evidence, so long as the waiver is knowing, intelligent, and voluntary. *Commonwealth v. Randolph,* 582 Pa. 576, 873 A.2d 1277, 1282 (2005).[10] Given the consequences of such a decision, we have stressed that the trial court should conduct a thorough on-the-record colloquy. *Id.*[11]

Generally, a challenge to the validity of a waiver of mitigating evidence would be assessed by examining the thoroughness of the colloquy to ensure that the defendant fully understood the nature of the right and the consequences of waiving the right. *See, e.g., Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1027–29 (2007); *id.* at 1034 (Castille, J., concurring). In this case, however, appellant did not challenge the colloquy at trial or on direct review, and so no such claim is preserved. Instead, appellant's extra-record claim is that trial counsel knew or had reason to know that appellant was not competent to waive the presentation of mitigating evidence given his history of mental illness and his mental state at the penalty phase of the trial. Thus, the sufficiency of the colloquy is not at issue.

This Court has not had the opportunity to define a standard of competency for waiving the presentation of mitigating evidence. Likewise, the U.S. Supreme Court has not

10. While this court has assumed that the waiver of presenting mitigating evidence must be according to the constitutional standard of knowing, intelligent and voluntary, the U.S. Supreme Court recently observed that "[w]e have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Schriro v. Landrigan,* 550 U.S. 465, ——, 127 S.Ct. 1933, 1942, 167 L.Ed.2d 836 (2007).

11. A colloquy, of course, is a salutary way of ensuring that the defendant understood the nature of the right being waived. There is not, however, any constitutional requirement of or right to a colloquy before waiving mitigating evidence. *Schriro,* 550 U.S. at ——, 127 S.Ct. at 1943; *see also Commonwealth v. Mallory,* 941 A.2d 686, 697 (Pa.2008).

specifically addressed this question, although it has indicated that competence to plead guilty or waive the right to counsel is the same as competence to stand trial. *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). This Court followed *Godinez* in *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1339 (1995), noting that the "competency standard for waiving the right to counsel is precisely the same as the competency standard for standing trial, and is not a higher standard." We see no reason for adopting a different standard here, where the constitutional right to present mitigating evidence, *see, e.g., Oregon v. Guzek,* 546 U.S. 517, 526, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006) (Eighth Amendment requires "that a sentencing jury be able to consider and give effect to mitigating evidence about the defendant's character or record or the circumstances of the offense") (internal quotation marks omitted) is at issue. *See Starr,* 664 A.2d at 1338 (U.S. Supreme Court's jurisprudence has set invariable standard for waiving any constitutional guarantee); *see also Coleman v. Mitchell,* 244 F.3d 533, 545 (6th Cir.2001). In Pennsylvania, that standard is generally understood to be whether the defendant has the ability to consult with counsel with a reasonable degree of understanding and whether the defendant has a rational understanding of the nature of the proceedings. *Commonwealth v. Appel,* 547 Pa. 171, 689 A.2d 891, 899 (1997). In other words, a defendant will be deemed competent when he in fact understands both the significance and consequences of the waiver decision. *Starr,* 664 A.2d at 1336. Finally, in considering competency, the court must keep in mind that "the focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the **ability** to understand the proceedings." *Starr,* 664 A.2d at 1339 (quoting *Godinez, supra* ).

■■■ Applying this standard, the PCRA court did not err in rejecting this claim. Significantly, appellant's experts never opined that appellant lacked the capacity to understand the proceedings and what he was waiving. In fact, the defense experts opined to the contrary—that appellant clearly understood the nature of the proceedings, but had given up on the

system. Such testimony, if believed, may explain the reason for appellant's decision, and even that there was an emotional element to the decision, but it does not provide the basis for a finding of **incompetency** to waive mitigating evidence. Thus, appellant's competency-related claim of trial counsel ineffectiveness fails.

Furthermore, there is force to the PCRA court's assessment that trial counsel's and its own contemporaneous observations regarding appellant's competency to waive mitigation must be given consideration, since these observations are relevant to assessing trial counsel's conduct at the time of the waiver and the penalty phase proceedings. In this regard, it is significant that appellant's experts conceded that he was competent prior to the penalty phase of the trial. Absent proof that something in appellant's subjective behavior or conduct should have caused counsel to believe that the guilty verdict rendered appellant incompetent, counsel cannot be faulted. Nothing in the law suggests that an expression of a desire to waive mitigating evidence requires an inquiry into the capacity of the capital defendant.

■ Appellant's second argument respecting his waiver of mitigating evidence is that trial counsel was ineffective for failing to adequately investigate potential mitigating evidence. Taking an absolutist position, appellant argues that, before a waiver of mitigating evidence can be deemed knowing, intelligent, and voluntary, counsel **must** investigate potential mitigating evidence and present that evidence to his client. Appellant poses that an individual cannot validly waive something if he has not been told what it is he is waiving. According to appellant, counsel's performance can only be evaluated in light of the available mitigating evidence. Appellant points to *Strickland* and to *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) in support of his claim. Referring to the mental health records from the Sierra Clinic, appellant argues that counsel was on notice that appellant suffered from mental health problems, and yet failed to investigate this critical area of inquiry. Appellant also argues that counsel had no reasonable strategy in failing to undertake

such an investigation, since counsel admitted that the bulk of his investigation was spent on the guilt phase and that he spent little time developing a penalty phase strategy. Appellant argues that the federal courts have concluded that the failure to prepare mitigating evidence is not a strategic choice between options, but an abdication of the minimum performance required of defense counsel. Finally, appellant argues that he was prejudiced by counsel's failure, since even a cursory investigation would have revealed a "plethora of relevant and compelling mitigation evidence which he could have presented to his client in an attempt to educate his client as to the extent of the rights he was waiving and to convince his client that there was a compelling case to be made to the jury for life." Appellant's Brief at 57.

The Commonwealth responds that appellant's waiver of the presentation of mitigating evidence at the penalty phase was knowing and voluntary. The Commonwealth emphasizes that the trial court informed appellant that, in light of his waiver, if the jury found one aggravating circumstance then a sentence of death would have to be imposed. The Commonwealth also notes that appellant has never taken the position that counsel did anything against his express wishes. Indeed, the Commonwealth notes, appellant did not testify at the PCRA hearing, and thus, he did not attempt to prove that the outcome of the waiver would have been different if only counsel had presented appellant with the case in mitigation he could have mustered. Thus, the Commonwealth concludes: "In light of the position Appellant took during the colloquy, what other choice did [trial counsel] have? ... Appellant could have been called ... to testify to the limited issue of his wishes at the time of the Penalty Phase, yet he has never said a word. Appellant does have an obligation to speak ... as it is his burden to prove these claims; his silence speaks volumes." Commonwealth's Brief at 25.

In rejecting this claim, the PCRA court noted that it conducted a full and thorough colloquy and appellant expressly waived his right to present mitigating evidence after the conclusion of the colloquy. Like the Commonwealth, the

PCRA court stressed that it advised appellant that, by making the decision not to present mitigating evidence he would be ensuring his own death. Furthermore, the PCRA court explained that it did not believe that any mental health evaluation of appellant was necessary. Indeed, the court recollected that during an earlier argument in the proceedings, appellant had threatened to "fire" counsel if he persisted on such a claim. Citing this Court's unanimous opinion in *Commonwealth v. Taylor*, 553 Pa. 144, 718 A.2d 743, 744 (1998) for the proposition that counsel cannot be deemed ineffective for failing to override his client's decision to waive mitigating evidence, the court concluded that appellant's claim failed. PCRA Ct. Op., 9/8/04, at 6.

At the time this matter was briefed, the parties did not have the benefit of this Court's recent decision in *Commonwealth v. Rega, supra*, or the U.S. Supreme Court's decision in *Schriro v. Landrigan*, 550 U.S. 465, ——, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). Both cases are helpful in our assessment of the present claim.

In *Rega*, this Court analyzed a claim similar to the one appellant presents herein. In that case, the defendant was "ambivalent" about the penalty phase, but "adamant" that counsel not present evidence suggesting that his mother was a bad parent, or "any kind of psychological testimony." Counsel abided by the restriction and presented a truncated case in mitigation, painting a positive picture of the defendant, and the jury found a mitigating circumstance, albeit the jury returned a sentence of death. On post-verdict motions, the defendant claimed that his trial counsel were ineffective in failing to ignore the restrictions he placed upon them and develop further mitigation evidence, including evidence in the areas he specifically ordered them not to pursue. In rejecting the claim, the *Rega* Court noted that while certain jurisdictions require capital counsel to conduct an investigation into potential mitigating evidence in instances where the defendant desires to waive such evidence, Pennsylvania is not among them. Thus, a defendant's waiver of mitigating evidence is valid so long as it is knowing, intelligent, and voluntary. By

the same token, we held, when such a waiver is valid, counsel cannot be deemed ineffective for abiding by the restrictions on mitigation imposed by his client. Because the waiver in *Rega* was valid, the claim of ineffectiveness failed. 933 A.2d at 1026–28.

In *Schriro*, the capital defendant directed his counsel not to present mitigating evidence at the penalty phase, and the defendant was sentenced to death. On collateral review, the defendant sought a hearing to present potential mitigating evidence in support of a claim that counsel was ineffective for failing to explore "additional grounds" in mitigation. The state trial court denied relief without a hearing. Sitting in habeas review, the federal district court likewise denied relief without a hearing. The Court of Appeals for the Ninth Circuit reversed and remanded for an evidentiary hearing, opining that the defendant had raised a "colorable claim" that his counsel's performance fell below the *Strickland* standard, that the investigation would have revealed a "wealth of mitigating evidence," and that the defendant's last-minute decision could not excuse counsel's failure to conduct an investigation prior to trial. *Schriro*, 127 S.Ct. at 1939.

The U.S. Supreme Court granted further review and reversed the Ninth Circuit. As relevant here, the High Court noted that, when a capital defendant instructs his counsel not to offer mitigating evidence, "counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Id.* at 1941. The Court then expanded upon this observation, explaining that it was reasonable for the District Court to conclude that, regardless of the additional information that counsel might have uncovered, the defendant would have refused to allow his counsel to present that evidence. The Court based its determination, in part, on the language of the colloquy, which established that the defendant told his counsel he did not want to present mitigating evidence and told the court that there was no relevant mitigating evidence to present. "Accordingly, the District Court could conclude that because of [the defendant's] established recalcitrance, he could not demonstrate prejudice under *Strickland* even if granted

an evidentiary hearing." *Id.* at 1942. The Court further explained that neither *Wiggins* nor *Strickland* involved a situation in which a client interfered with counsel's efforts to present mitigating evidence. Therefore, the Court concluded, "it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *Id.* at 1942.[12]

In light of *Rega* and *Schriro,* the PCRA court plainly did not err in dismissing this claim. Like the defendant in *Schriro,* appellant was insistent that he did not want to present any mitigating evidence. N.T., 11/8/93, at 1024–26. Indeed, following the trial court's initial colloquy, the court gave appellant and his counsel an additional 40 minutes to discuss the presentation of mitigating evidence. Following the break, appellant reasserted that he had no interest in presenting mitigating evidence. *Id.* at 1035–37. Since appellant steadfastly maintained that he did not want to present mitigating evidence, counsel's failure to investigate potential mitigating evidence could not have been prejudicial under *Strickland.* *See Commonwealth v. Mallory,* 941 A.2d 686, 699 (Pa.2008) ("A showing of *Strickland* 'actual' prejudice requires the defendant to show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'") (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Furthermore, we note that there is no challenge to the substance of the waiver colloquy, which appears on its face to have been thorough, and thus, for present purposes, we must presume the waiver to have been knowing, voluntary, and intelligent. *See* N.T., 11/8/93, at 1022–33. Finally, as the Commonwealth aptly notes, appellant did not testify at the PCRA hearing and thus he did not

---

**12.** We recognize, of course, that the *Schriro* decision was rendered on habeas review, and thus some of the Court's observations are couched not as absolutes under *Strickland,* but rather, in terms of the reasonableness of the state court's decision in applying Supreme Court precedent. Nevertheless, the Court's teachings on the importance and effect of a defendant's directives to counsel concerning mitigation are obviously highly relevant here.

attempt to establish that, if only counsel had undertaken an investigation of mitigation evidence, he would have relented and permitted counsel to present a case in mitigation. In short, he has not shown that the outcome of his waiver of mitigation would have been different but for counsel's inaction. For all of these reasons, this claim fails under *Strickland.*

Appellant's final claim related to counsel's abiding by his directive not to present mitigating evidence is that trial counsel abdicated his role as counsel by ignoring significant evidence of appellant's mental health history, thereby constructively denying appellant his right to counsel under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Appellant's argument stems from counsel's closing argument at the penalty phase where, appellant says, counsel "affirmatively argued for death." (In his argument, appellant repeats this characterization without quoting the relevant argument or citing the relevant pages.) This conduct, in conjunction with counsel's ignoring significant mitigating evidence, leads appellant to conclude that he was effectively without counsel at the penalty phase, triggering the *Cronic* exception to *Strickland.*

The Commonwealth responds by noting that the penalty phase course dictated by appellant severely restricted the options available to counsel: there was no mitigating evidence to argue. Furthermore, echoing the findings of the PCRA court, the Commonwealth argues that counsel did not argue affirmatively for death, but only argued "that the jury should do what it had to do." Commonwealth's Brief at 25 (quoting PCRA Ct. Op., 11/16/04, at 8).

Under *Cronic,* prejudice may be presumed in those instances when counsel's failure has been so complete that it is as if the right to counsel has been denied. *See Mallory,* 941 A.2d at 700. The U.S. Supreme Court, however, has emphasized that such instances are rare. *See Florida v. Nixon,* 543 U.S. 175, 190, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Furthermore, this Court, which has extended *Cronic* to areas not yet passed upon by the High Court, has stressed that *Cronic* is

limited to cases where "the acts or omissions of counsel were of the type that are virtually certain to undermine confidence that the defendant received a fair trial or that the outcome of the proceedings is reliable, primarily because they remove any pretension that the accused had counsel's reasonable assistance during the critical time frame." *Mallory*, 941 A.2d at 700 (quoting *Commonwealth v. Cousin*, 585 Pa. 287, 888 A.2d 710, 718 (2005)).

This case does not rise to the level of ineffectiveness envisioned by *Cronic* and the cases that have followed that decision. Counsel did not abandon appellant; rather, it was appellant who decided to abandon a penalty phase defense, thus tying the hands of counsel. As we have noted in passing upon appellant's related claims above, there is nothing to indicate that counsel here did anything other than follow his client's unambiguous wishes. Furthermore, it is clear that both trial counsel and the trial court urged appellant to present mitigating evidence. N.T., 11/8/93, at 1033–35. To the extent a verdict of death was a formality—particularly since the aggravating circumstance was multiple murders—it was made so by appellant's own insistent decision. Finally, appellant's argument concerning *Cronic* misperceives its role *vis-à-vis Strickland*. Where *Cronic* applies, it dispenses with the need to prove prejudice. The primary difficulty with appellant's current claim does not have to do with prejudice, however; rather, it has to do with the responsibility for that prejudice. The responsibility rests with appellant, not his counsel. Accordingly, this issue is without merit.

 Appellant's penultimate issue challenges the trial court's instruction regarding aggravating circumstances. Appellant asserts that the trial court incorrectly stated the law when it instructed the jury that "any one of you can" find an aggravating circumstance, and that such a circumstance "doesn't have to be established to the satisfaction of all of you unanimously." N.T., 11/8/93, at 1040. Appellant argues that such an instruction is directly contrary to the law requiring that the jury must find the existence of an aggravating factor unanimously. 42 Pa.C.S. § 9711(c)(1)(iv). Appellant's final

sentence of his argument declares that trial counsel was ineffective for failing to object to the instruction.

The Commonwealth responds that this claim is waived for want of development under *McGill, supra.* Furthermore, the Commonwealth asserts that, considering the charge as a whole, it is clear that the trial court properly instructed the jury regarding aggravating circumstances throughout its instructions, but merely misspoke at this one juncture. N.T., 11/8/93, at 1040, 1050, 1053–54, and 1057. Additionally, the Commonwealth points out that any uncertainty surrounding whether the jury understood that aggravating circumstances needed to be found unanimously was put to rest when the jury foreman stated that "the aggravating, um, circumstance **unanimously found** is . . . ." N.T., 11/10/93, 1060 (emphasis added); *see also id.* at 1061 ("The aggravating circumstance unanimously found is the Defendant has been convicted of another murder committed either before or at the time of the offense at issue.").[13] The PCRA court agreed with the Commonwealth and concluded that appellant waived this claim under *McGill.*

We agree with the Commonwealth and the PCRA court that this claim is waived. Appellant has failed to make or develop his argument as to any of the three prongs of an ineffectiveness claim relating to trial counsel's conduct. Particularly given the statement of the jury foreman announcing the verdict, and the verdict slip, appellant's fixing upon one misstatement, and failing to develop the claim with respect to the proper review paradigm, dooms the claim to failure.

Appellant's final argument is that his convictions and sentence of death constitute a miscarriage of justice. Specifically, appellant contends that he has proven his innocence, since the supposedly "uncontested" scientific and medical evidence presented at the PCRA hearing by his experts demonstrates that Donna Puksar committed suicide. According to appellant, the

13. The verdict slip also clearly provided that the aggravating circumstances were to be found unanimously. *See, e.g., Commonwealth v. Duffey,* 585 Pa. 493, 889 A.2d 56, 70 (2005) (recognizing importance of properly communicating law by written instructions on verdict slip).

case against him was insufficient without the testimony of Dr. Mihalakis and Dr. Mihalakis's testimony was so scientifically unreliable that it could not support the conclusion that appellant murdered the two victims. Appellant then contends that the relatively weak Commonwealth case led the Commonwealth to misrepresent material facts by telling the jury that appellant wiped the gun clean, when it knew such evidence to be false, and by arguing that Donna Puksar knew nothing about guns and denying that the victims were experiencing marital discord. Appellant concludes that the evidence in this case was so unreliable and untrustworthy as to violate due process.

Appellant's argument in this regard is essentially a jury argument, and not a viable claim under the PCRA. The PCRA does not recognize "miscarriage of justice" as a distinct, standalone constitutional claim. Moreover, all of these arguments have been discussed in some fashion above, and there is simply no reason to relitigate them via appellant's catchall reiteration. Furthermore, the Commonwealth literally had nothing to prove at the PCRA hearing, as it was appellant's burden to prove that his counsel acted ineffectively. Therefore, the Commonwealth did not need to "contradict" appellant's experts in order to prevail; and certainly, the Commonwealth's decision not to present contrary evidence did not establish appellant's "innocence."

For the foregoing reasons, we affirm the PCRA court's order dismissing appellant's petition. We direct the Prothonotary of this Court to transmit a complete record of this case to the Governor, pursuant to 42 Pa.C.S. § 9711(i).

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice SAYLOR, EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.