J-S59030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD M. DODDS | : | No. 2222 EDA 2018 |

Appeal from the PCRA Order Entered June 27, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0014515-2010

BEFORE: LAZARUS, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY NICHOLS, J.: Filed: September 24, 2020

The Commonwealth appeals from the PCRA court's order granting the

Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, petition filed by

Appellee Richard M. Dodds. The Commonwealth contends, among other

things, that the PCRA court erred by holding that Appellee established

prejudice from his trial counsel's failure to timely inquire into Appellee's

mental health. We agree with the Commonwealth and reverse the PCRA

court's order.

We state the facts as set forth in this Court's decision on direct appeal:

On October 31, 2010, Ian Hirst–Hermans ("Hirst–Hermans"),
Justin Boylan ("Boylan"), Vincent Gasparo ("Gasparo"), and
Christian Succecci ("Succecci") attended a party in . . .
Philadelphia. All attended Temple University. Before attending
the party they visited other friends, and beginning at 8:00 p.m.,
along with Andres Choi ("Choi") and Austin Heron ("Heron"),
they walked to Brian Jerome ("Jerome")'s house for the party.

After arriving, the group greeted friends. Hirst–Hermans and Boylan also spoke with two girls they did not know, Shannon Bouvia ("Bouvia") and Anna Marczak ("Marczak"), who were in costume as "bunnies." While they were downstairs, [Appellee] confronted Hirst–Hermans for talking to Bouvia, and Hirst–Hermans walked away. At one point, Boylan noticed [Appellee] watching them intently from the opposite side of the kitchen.

Although he and Hirst–Hermans ignored [Appellee], the glares continued. Boylan asked Bouvia if she knew [Appellee], and she replied that he was her brother.

After about an hour, Boylan went upstairs with the girls. Bouvia admitted [Appellee] was her boyfriend, not her brother, and after that admission Boylan ceased talking to her. Boylan and Hirst–Hermans exchanged words with [Appellee] during the party. Boylan went back downstairs to visit with three or four friends in the kitchen. At least twenty minutes after he first saw [Appellee], Hirst–Hermans overheard him tell Bouvia that Boylan was a "douchebag." Hirst–Hermans told [Appellee] to shut up.

Choi and Hirst–Hermans observed [Appellee] by the door, muttering angrily. Seeing Hirst–Hermans was uneasy, Choi asked whether he wanted Choi to say something to [Appellee]. Choi then approached [Appellee] and they argued; Choi threw the first punch, hitting [Appellee] in the face, and [Appellee] fought back. The fight escalated to wrestling on the ground, and when Hirst–Hermans attempted to drag Choi away from [Appellee,] he was pulled down as well. [Appellee] punched Hirst–Hermans in the back as Hirst–Hermans held him in a bear hug. The fight lasted about fifteen seconds before other party guests broke it up.

[Appellee] was then asked to leave, and Boylan and his friends returned to the party. . . .

It was approximately 2:00 a.m. by the time Hirst–Hermans and Boylan left the house, walking up 17th Street towards Edgley Street. [Appellee] approached from around the corner, walking in a circle around them, and the three men came to a stop in the intersection. [Appellee] yelled, "You little fucking pussy; you don't want to fuck with me, you fucked with the wrong dude."

Hirst–Hermans exchanged "trash talk" with [Appellee] before he stopped and asked, "What are you doing, what's going on?" [Appellee] came to a halt about four or five feet in front of the two men, pointing a gun at Hirst–Hermans. Hirst–Hermans asked, with his arms held down by his thighs, "Are you going to shoot me?" [Appellee] then fired a single shot at Hirst–Hermans' chest.

Hirst–Hermans fell to the ground in the middle of the street, vomiting and bleeding heavily from his mouth and the right side of his chest. His eyes rolled up in his head and his face turned white. Boylan, Jerome, Neil Tierney ("Tierney") and Heron ran to him and together turned Hirst–Hermans over. Boylan called 911 while Heron and Tierney pressed down upon Hirst–Hermans' chest, trying futilely to stop the bleeding. [Appellee] remained standing at the scene with the gun in his hand.

At around 2:00 a.m., Police Sergeant Miranda Cruz, responding to an unrelated back-up call, was driving southbound on 17th Street and noticed a large crowd of people gathered at 17th and Edgley Streets. As she left her car to investigate, she saw [Appellee] walking towards her with a black handgun, his arms held straight out and pointing the gun at her chest. [Appellee] told her that he had just shot a male, it was in self-defense, and he had a license to carry. Sergeant Cruz ordered [Appellee] to drop the gun but he did not comply, and so she called for immediate assistance. [Appellee] still did not drop the gun, though Sergeant Cruz ordered him to do so or she would shoot him. The scene was chaotic with many witnesses yelling that [Appellee] had shot Hirst–Hermans. By the time backup arrived, Sergeant Cruz stood over [Appellee] pointing her gun at him, with his own gun on the ground. Officers approached [Appellee] and ordered him to put the gun down. . . .

*Commonwealth v. Dodds*, 287 EDA 2014, 2014 WL 10558255, *1-*2 (Pa. Super. filed Nov. 25, 2014) (unpublished mem.) (citation omitted). The case proceeded to a jury trial.

On the morning of July 11, 2013, which was the second day of trial, and before the jury entered the courtroom, Appellee's trial counsel

- 3 -

requested a psychological exam, prompted by Appellee's "not appropriate" responses to questions. *Id.* at *4. Trial counsel stated, "based on [Appellee's] behavior the last several days I'm asking the court to order a forthwith psych before we proceed any further with trial based on information that I have and his behavior I'm questioning whether he is competent to proceed at this point for trial." N.T. Trial, 7/11/13, at 3.

The trial court asked trial counsel to detail his concerns without "breaching confidentiality." *Id.* Trial counsel responded:

> Since he authorized me to give this information that I just received this morning. He is currently under an involuntary commit outpatient at Norristown and he's under treatment there. The paperwork that I received regarding the involuntary commit indicates as of now he is really mentally disabled.[1] This is again what he authorized me to reveal to you just now at the bar of the court when I asked if I can share this information to the court regarding his competency.
>
> THE COURT: This is coming to your attention now?
>
> [Trial counsel]: Yes, Judge. I knew he was outpatient but there's no information from my conversations with him which is every week for the last several months and the family to suggest that he would not be competent to stand trial.
>
> THE COURT: When did they suggest that?
>
> [Trial counsel]: They've never suggested that.
>
> THE COURT: They've never suggested that?

---

[1] Trial counsel later clarified that the paperwork established Appellee was "mentally disturbed." N.T. Trial, 7/11/13, at 12.

[Trial counsel]: I've had no discussions with the parents regarding that issue, Judge.

THE COURT: Okay.

[Trial counsel]: But the paperwork that I received this morning I would not be doing my job so I ask to have him evaluated.  His behavior and his response to questions are not appropriate.

THE COURT: Response to your questions you mean?

[Trial counsel]: Yes. During conversations, I can't say what we talked about.  The point where I feel he should be evaluated before we proceed further.

*Id.* at 3-5.[2]

In response to the trial court's inquiry about how long Appellee had been in outpatient treatment, trial counsel referred to the hospital paperwork stating that as of June 19, 2013 (just under a month before trial), there was a "notice of intent to file a petition for extended involuntary treatment for up to ninety days for a 304[3] commit.  Again it's outpatient again that's why [Appellee's] on the streets." *Id.* at 5.  The paperwork stated that the hospital filed the petition to have Appellee committed and that Appellee was being treated for post-traumatic stress, alcohol abuse, and a third entry that was "cut off" on trial counsel's copy of the paperwork. *Id.*

---

[2] The **Dodds** Court correctly noted that the "record is silent as to how [Appellee's] responses were inappropriate.  Conversations between [Appellee] and defense counsel were privileged." **Dodds**, 2014 WL 10558255 at *4 n.4.

[3] Section 304 of the Mental Health Procedures Act.  50 P.S. § 7304.

at 6. The trial court acknowledged that a competency exam could be done "right now." *Id.*

The Commonwealth objected, finding it suspicious that trial counsel "had no idea beforehand" about Appellee's involuntary commitment less than a month earlier. *Id.* at 8. The trial court questioned trial counsel, "If competency was a concern of yours why wouldn't you have brought it to this court's attention immediately . . . that's my question to you." *Id.* at 9.

Trial counsel responded as follows:

[Trial counsel]: My concern, Judge, is my contact with him has been regarding scheduling. We've already prepared this case as it is three years old. Scheduling in terms of having this witness here available on this case. It's been by e-mail and by e-mail phone message. So given the age of the case he was not in my office. He was not -- was never a face to face until we came to court. And he has been behaviorally changing every day since we started this case. There were communications between yesterday at the end of court and this morning at 4:00 a.m. that lead me to believe at this point I need ethically and professionally to have him examined by a professional and if a professional says he's good to go then I'm good to go. I'm not asking for a continuance. I want this case to be resolved to a verdict. This guy never should have to do a trial.

*Id.* at 9-10.

After further discussion, the trial court considered "sending [Appellee] down during the lunch hour for a competency test." *Id.* at 11. After another exchange, the trial court observed that Appellee's "parents have been here every day with him, at prior listings. I can't believe they didn't bring this to your attention if clearly he's mentally disabled." *Id.* at 13. The

trial court subsequently ordered a "forthwith mental competency" exam. *Id.* at 14.

After an off-the-record discussion and an unknown period of time, the trial court stated the following on the record:

> The competency report was given orally to both counsel and then to this court by phone through Dr. [Robert] Stanton and Dr. Stanton indicated to the court via telephone that [Appellee] is competent right now but that based on an indication from [trial counsel] if necessary that [Appellee] should be evaluated daily for competency unless [trial counsel] indicates that it's not necessary. That's what Dr. Stanton revealed to the court. Do either of you have any discussion, objection, any further inquiries you would like to make at this time?
>
> [Assistant District Attorney]: No, Your Honor.
>
> [Trial counsel]: Your Honor, if the understanding is that the court will entertain a reevaluation as time progresses throughout the trial at this point I will agree to go forward without requesting a hearing with Dr. Stanton testifying in front of Your Honor. I do feel that there's more to competency about who a DA is, what a judge does, and what a jury does. It's whether you can effectively assist your attorney in your defense. At this point given Dr. Stanton's frank assessment that [Appellee] is mentally ill I don't necessarily feel I'm getting that right now. I will revisit that as I see [Appellee] progresses throughout the trial.
>
> THE COURT: Very well. So for right now I'll make a finding that [Appellee] is competent to proceed to trial today or to continue to trial today.

*Id.* at 14-16. The case then proceeded.

On the morning of the next day at trial, after an off-the-record discussion, the following exchange transpired out of the jury's presence:

> [Trial counsel]: Your Honor, this morning I was here before 9:00. I had a conversation with [Appellee] that lasted about 15

minutes. So I walked in about quarter after you were already taking the list. I was talking to your staff and I would like [Appellee] evaluated again and on Monday because Dr. Stanton was very specific that he may be it's a very fluid situation competency. He said barely competent. Today he's competent. I don't know how he's going to be tomorrow. You can have a psychotic episode. Based on my conversations with [Appellee] today I feel he should be evaluated today and Monday to be honest.

THE COURT: What's your basis for that? It's not my intent to just evaluate him every single day without need. If you have a legitimate basis for it, I'm not sure there's a legitimate basis for an evaluation today. I don't have a problem doing it if it needs to be done. I've seen mentally incompetent ill people, we all have in our empirical experience but we've all seen that. However, in this particular case it was nothing I don't really see anything that was manifested in open court. However, you went down there in the evaluation and the verbal came back competent with the caveat that it may need to be done again and you would let the court know if you thought it was of a concern. But I don't expect that to mean I'm going to send him down no matter what. You have to have a legitimate basis for the request.

\* \* \*

THE COURT: Not since the trial has begun. He had an evaluation yesterday and we started around 1:30 so we ended the trial at 4:15. Exactly 4:15 yesterday afternoon until today which is less than 24 hours what have you observed that's or I don't know how long you spent with him yesterday between yesterday and today what's happened in that short period of time that's caused you to have concerns about his competency at this point. That's the only gap of time that I'm concerned with.

[Trial counsel]: Does he know what a judge is? Yes. Does he know what a DA is and defense attorney is? Yes. Does he know what a jury is, yes. Does he answer questions in an appropriate manner that he feels is on his own? No. Is he making decisions on his own, I don't believe he is right now so how can he make a decision about whether he should testify or not.

- 8 -

THE COURT: What do you mean answer questions or not, do you have an example of that.

[Trial counsel]: Obviously I can't talk about our conversations. But the DA was in the room and what was talked about in the room is not confidential. It was clear in speaking to him that he has a severe mental disability. The doctor acknowledged he could have a psychotic episode at any day. So when I'm speaking with him the responses I get I can't tell you what we're talking about, Judge, they make me feel he is not capable of making a decision for himself, important decisions like should I testify. That to me is just as much if not more of a competency issue than if he knows who a judge is. Of course he knows what a judge is. I mean he's not ignorant. He's mentally disable[d]. In this case we have something that's an involuntary commit for the next ninety days. I didn't know about it until the trial but one doctor has him at Norristown state hospital. He's been committed two weeks.

THE COURT: As far as I'm concerned that's of no moment. I have a finding yesterday of him being competent so like I said my only concern is what's happened since 4:15 yesterday and this morning that has you changing your mind. His answers different or is he giving you different responses now than what he gave you yesterday is that the change, has there a change or is that the same thing that you've had all along, that's my question.

[Trial counsel]: Judge, yesterday --

THE COURT: No, answer my question. Are his answers or his responses the same as they were before the evaluation or is he giving a different response now?

[Trial counsel]: He's still giving answers that are not appropriate and I don't feel that he can give a response in making his own decision.

THE COURT: Is that the same?

[Trial counsel]: Yes.

THE COURT: Nothing that's different. Anything from the Commonwealth?

[Assistant District Attorney]: Your Honor, I did sit in on the evaluation also and agree with the doctor that he's competent yet does he have mental health issues, sure, but way different than someone being competent. Your Honor, in this case . . . it's not the defense case yet so if there's greater concerns next week and something changes then before it becomes the defense case --

[Trial counsel]: Judge, I will advise the court I intend on one day I will litigate a motion to challenge Dr. Stanton's findings.

THE COURT: The motion is denied.

[Trial counsel]: I object to the court[']s ruling. . . . On my motion to have him evaluated I would like it noted for the record it's now 11:05 and we're just [bringing in] the jury[.] [Appellee] and I have been here since 9:00 ready to have him evaluated. [Appellee] when he met Dr. Stanton yesterday was instructed to take his medication to alleviate symptoms he might have had. He has done that. As a result he is drowsy to the point of falling asleep. I've had several conversations with him where he drifted off. There may be situations where I may ask the court for an unexpectedly or without notice of a comfort break so that he'll need to walk around or eat something or he might not be able to stay awake.

THE COURT: Very well.

\* \* \*

[Trial counsel]: I'm not stipulated [sic] that [Appellee] is competent, Judge.

[THE COURT]: I understand that. . . .

N.T. Trial, 7/12/13, at 3-8.[4]

---

[4] Subsequently, Appellee "elected not to testify on his own behalf." **Dodds**, 2014 WL 10558255 at *4. Trial counsel and the trial court gave a colloquy to Appellee. **Id.**; **see** N.T. Trial, 7/13/13, at 141-48. The trial court
*(Footnote Continued Next Page)*

- 10 -

A jury convicted Appellee of aggravated assault and possession of an instrument of crime. ***Dodds***, 2014 WL 10558255 at *3. Following a pre-sentence investigation and mental health report, the trial court sentenced Appellee to ten to twenty years' imprisonment. ***Id.***

Appellee timely appealed to this Court and challenged, among other issues, whether the trial court abused its discretion by refusing to grant the mid-trial request by Appellee's trial counsel for a second psychological exam. ***Id.*** The ***Dodds*** Court held that Appellee failed to "establish that [he] did not understand the nature of the proceedings against him or that he was unable to assist in his own defense."[5] ***Id.*** at *4. Appellee did not file a petition for allowance of appeal with our Supreme Court.

*(Footnote Continued)* ───────────────

concluded it was satisfied Appellee "made a knowing, intelligent waiver of his right to testify . . . ." N.T. Trial, 7/13/13, at 146. The jury retired to deliberate and, in relevant part, asked the trial court if it could consider Appellee's courtroom demeanor. N.T. Trial, 7/17/13, at 2. Appellee's trial counsel argued that the jury should not consider Appellee's demeanor because on the second day of trial, Appellee was "very medicated to the point he could barely keep his eyes open." ***Id.*** at 3. After hearing the Commonwealth's argument, the trial court instructed the jury that it must disregard Appellee's demeanor and base its verdict only on the evidence. ***Id.*** at 4.

[5] In the direct appeal, this Court reasoned as follows: "On the second day, the trial court granted [Appellee] the opportunity to show that circumstances had changed overnight, such that he no longer was competent to stand trial. [Appellee's] counsel ventured nothing but vague and conclusory allusions to inappropriate answers to questions in their private discussion." ***Dodds***, 2014 WL 10558255 at *4. The ***Dodds*** Court continued: "Furthermore, [Appellee] did not request a reevaluation in the days that followed. Later in the trial, [Appellee] knowingly and intelligently declined to testify on his own
*(Footnote Continued Next Page)*

- 11 -

On June 9, 2015, Appellee filed a counseled PCRA petition, which alleged trial counsel "was ineffective for failing to **timely** investigate [Appellee's] competency to stand trial." PCRA Pet., 6/9/15, at ¶¶ 21, 29 (emphasis added). PCRA counsel claimed that Appellee "had a severe history of mental illness" that Appellee's trial "counsel did not discover[] until the second day of trial." *Id.* at ¶ 22. PCRA counsel also noted that trial counsel "admitted that he did not meet with [Appellee] in person until the time of trial but only communicated by email or telephone." *Id.* In PCRA counsel's view, "it is reasonable trial practice to meet with a client in person prior to trial to assess his or her credibility especially in light of the fact that counsel was considering a justification defense where the client might testify." *Id.* PCRA counsel concluded that trial counsel's "failure to do so" prejudiced Appellee because Appellee "could not meaningfully participate in his defense." *Id.* at ¶ 25.

The Commonwealth filed a motion to dismiss, and the PCRA court held an evidentiary hearing on May 23, 2016. We state the PCRA court's findings, as set forth in its Pa.R.A.P. 1925(a) opinion:

*(Footnote Continued)* ────────────

behalf, and the record does not indicate that his behavior changed after he first was deemed competent to stand trial." *Id.* The Court concluded, "[t]his limited record is insufficient to establish that [Appellee] did not understand the nature of the proceedings against him or that he was unable to assist in his own defense." *Id.* The **Dodds** Court also denied relief on Appellee's remaining challenge to the discretionary aspects of his sentence. *Id.* at *6.

Christopher Phillips, Appellee's trial counsel, was called by the defense. From the beginning of trial preparation and meetings with Appellee, Appellee's family, and other witnesses, Phillips had always intended to argue that Appellee acted in self-defense. Phillips hoped to present Appellee's testimony at trial in support of that defense, as his state of mind was critical. From November to May, 2013, Phillips was involved in a federal jury trial and though he communicated with Appellee regularly, they did not meet face-to-face from approximately May 2013 until the date of trial. In May or June, 2013, Phillips received a phone call from Appellee regarding a confrontation at a playground. Appellee seemed very agitated, which Phillips felt was out of character. Consequently, Philips called Appellee's father, who reassured Phillips that Appellee was "fine . . . he was stressed because the trial was coming imminent and . . . he was okay." Based upon this conversation and previous interactions with Appellee, Phillips assumed the agitation was an "isolated incident." Phillips alleges that during a phone call with Appellee two (2) weeks before the trial, he did not know Appellee was experiencing any mental health issues; he seemed as "normal" as he had in previous meetings. Prior to trial, in conversations with Appellee's family, Phillips alleges that there was no indication he was not competent to stand trial. Additionally, Appellee's family did inform Phillips he was attending outpatient therapy.

On the first day of jury selection, July 9, 2013, Phillips noted Appellee seemed a little nervous but was able to assist Phillips in picking a jury. On July 10, 2013, Appellee seemed "sleepy." On July 11, 2013, Phillips noticed Appellee was "not as alert" as he had seemed on the first day. Phillips met with Appellee and his family, at which time Appellee's family informed Phillips for the first time, according to his testimony, that Appellee had been recently involuntarily committed at Montgomery County Emergency Services [approximately one month before trial]. Records provided showed a diagnosis of post-traumatic stress disorder and alcohol dependency. Phillips testified at this time that Appellee's parents apologized to Phillips for not bringing the matter to his attention, and explained they were concerned Appellee would not be able to "handle" further delay of the trial. Although Phillips felt Appellee met the legal definition of competency, he requested a forthwith psych evaluation. Appellee was evaluated by the court psychiatrist, Dr. Stanton, and found competent to stand trial. Based upon conversations

- 13 -

with Dr. Stanton, Phillips requested a competency evaluation the following day, a request this court denied, then made an oral motion to challenge Stanton's findings, which was also denied.

During the trial, Phillips observed a positive improvement in Appellee's demeanor as his medication allowed him to sleep. In Phillips' opinion, although Appellee was legally competent, he was not able to assist in his own defense through testimony or cross examination. Additionally, Phillips was concerned with Appellee's demeanor during trial, as he "came off like he had some sort of mental health issue." After the Commonwealth rested its case and Appellee's witness, Shannon Bouvia, had testified regarding the events at the party, Phillips discussed again with Appellee's family whether he wished to testify and [could] effectively answer questions on cross-examination, and explained the potential risk of testifying. Phillips would have preferred to have Appellee's testimony on the record, and had [Appellee] been "similar to where he was before the trial," Phillips would have recommended Appellee testify. Ultimately, Phillips allows his clients to choose whether they will testify or not, but ultimately advised Appellee against testifying in his own defense.

Phillips did not believe he had the legal grounds for a mistrial, as the jury had not heard or seen anything that would prejudice them. He stated that though he believed Appellee had a competency issue, that issue had been addressed by the judge and court psychiatrist, over his objections, and the case was proceeding regardless and Phillips did not know how much time would be needed, so he did not ask for a continuance. Phillips believed that Appellee was capable of making a rational decision not to testify.

Richard Dodds, Appellee's father, testified at the hearing. Dodds testified that Phillips only met with Appellee in person only two (2) times prior to trial in which counsel and Appellee had any significant conversation regarding trial, the last time being sometime in July, 2012, although he later admitted that Phillips saw him "several times," including at the courthouse. Dodds testified that these other meetings were simply for Appellee to provide his signature, and at those meetings Appellee would simply provide his signature and leave. Dodds testified that during the two and a half year pendency from arrest to trial, Appellee began to have trouble sleeping and "becoming

- 14 -

psychotic." Appellee began behaving oddly, approaching middle school kids to talk to them about the dangers of gun violence and making statements that made no sense, such as that his boss had died, or that the mafia was trying to kill his boss. Dodds and his wife took Appellee to the family doctor to get him medication to help him sleep. On June 6, 2013, Dodds and his wife took Appellee to Einstein Hospital in Norristown, resulting in Appellee's involuntary commitment until June 21, 2013. After Appellee was released from the inpatient program, he took pills that made him "like a zombie . . . he wasn't even like the same person." Dodds testified, under oath, that he contacted Phillips by telephone and informed him of the involuntary commitment. Dodds testified that from the period of his son's release from involuntary commitment until the start of trial, Phillips did not contact Appellee in person or otherwise. Dodds stated he tried to give the hospital paperwork to Phillips, but could not get it "until the last minute." Dodds testified that he and his wife wished to get the trial "over with" as it had been delayed so long.

Dodds testified Appellee was a "zombie" and a "basket case" during the trial. Dodds testified that during the meeting with Phillips, he and his wife felt Appellee would do himself "more harm" by testifying, as they were afraid Appellee would "break down." [According to Dodds,] Appellee stated he wished to testify, and Dodds and his wife told him not to testify, partially based upon Phillips' advice. Dodds testified that during the colloquy regarding Appellee's decision not to testify, his son was "not in his right mind."

Nancy Dodds, Appellee's mother, also testified at the evidentiary hearing. She testified that she accompanied her son at least once to Phillips' office. She stated that on June 6, 2013, Appellee was acting very agitated all day, unable to sit still or sleep, and was not "acting right." She stated that Appellee talked to some children at a local middle school about gun violence, and that the police came to their home because some of the parents had called with concerns. The police then took Appellee to the hospital to have him evaluated, and he was admitted, and remained in the hospital for two weeks. She stated that Phillips did not see Appellee while he was in the hospital, nor at home after he was released, and that she knew her husband called Phillips to tell him about the commitment. She testified that they gave Phillips Appellee's discharge papers

after jury selection because Phillips never asked for them, and that, therefore, led them to believe that the papers were unimportant. She stated it was determined Appellee would not testify because of his mental state.

PCRA Ct. Op., 1/22/19, at 7-11 (citations and footnote omitted). Appellee did not testify at the PCRA hearing, which as noted above, occurred on May 23, 2016.

Almost two years later, on January 12, 2018, the PCRA court issued an opinion preliminarily denying Appellee's petition but did not issue a formal order denying Appellee's petition.[6] On April 16, 2018, the docket states "PCRA Decision Held Under Advisement."[7]

---

[6] The docket entry for January 12, 2018 includes a notation from the trial court that it would issue a new opinion if Appellee filed a notice of appeal. *See* Secure Docket, 1/12/18. We note that the PCRA court's January 12, 2018 opinion states that it denied Appellee's petition on September 29, 2016. The public docket for September 29, 2016, reflects "entry of civil judgment," but there is no corresponding document in the certified record transmitted to this Court. A copy of the secure docket included in the reproduced record reflects "entry of civil judgment" on September 29, 2016, with no further details. A copy of the appeal inventory transmitted to this Court as part of the certified record states the following for September 29, 2016: "PCRA Continued Case to be held under advisement Next court date to be determined Defendant in custody." There is no order dated September 29, 2016, in the certified record transmitted to this Court. We add that the PCRA court's January 12, 2018 opinion is framed as a Pa.R.A.P. 1925(a) decision, although Appellee could not have appealed.

[7] On that date, the PCRA court held a brief hearing, at which the court announced:

> THE COURT: So, I have this ruling filed based on the PCRA that was filed, the evidentiary hearing, and the response from the Commonwealth.

*(Footnote Continued Next Page)*

- 16 -

The PCRA court then scheduled another hearing for June 27, 2018, at which the PCRA court granted relief.[8] The secure docket entry for June 27,

_(Footnote Continued)_ ————————————

> This court still has jurisdiction of [sic] it. I am going to hold it under advisement a little longer before I do anything.

N.T. PCRA Hr'g, 4/16/18, at 3. It appears that the PCRA court was referencing the Commonwealth's motion to dismiss. The certified record transmitted to this Court did not include this transcript, among others. Because the Commonwealth included the omitted transcripts in its reproduced record and no party has objected to their accuracy, this Court will consider them. **_See generally_** Pa.R.A.P. 1921 cmt. (citing **_Commonwealth v. Brown_**, 52 A.3d 1139, 1445 n.4 (Pa. 2012)). We remind the parties that they "have a duty to take steps necessary to assure that the appellate court has a complete record on appeal . . . . Ultimate responsibility for a complete record rests with the party raising an issue" on appeal. **_Id._**

[8] The PCRA court, at the beginning of the hearing, announced as follows:

> THE COURT: Good morning. This matter had been listed a number of times and I think part of it was based on my reconsideration of all the arguments.
>
> And based on all of the arguments that I have heard thus far and despite what I filed already, which was premature, I understand that, but I am granting the new trial. I think that is the right thing to do.

N.T. PCRA Hr'g, 6/27/18, at 3. Following brief argument by the Commonwealth and Appellee's PCRA counsel, the hearing concluded. **_Id._** at 8.

2018, states in pertinent part, "PCRA Granted-New Trial is Granted."[9] Secure Docket, 6/27/18. The Commonwealth timely appealed.

On November 9, 2018, the PCRA court ordered the Commonwealth to comply with Pa.R.A.P. 1925(b). The secure docket reflects entry of the November 9, 2018 order, but does not specifically state "the date of service of the order." **See** Pa.R.Crim.P. 114(C)(2)(c). On December 6, 2018, the Commonwealth filed a petition to accept its Rule 1925(b) statement as timely filed because it lacked notice and also filed its Rule 1925(b) statement. The PCRA court did not rule on the Commonwealth's petition. The PCRA court filed a responsive Rule 1925(a) opinion that asserted that this Court should dismiss the Commonwealth's appeal because it failed to timely file a Rule 1925(b) statement but also addressed the merits.

### Untimely Rule 1925(b) Statement

Initially, we resolve the Commonwealth's contention that this Court should not dismiss its appeal because it filed its Rule 1925(b) statement six days late. Commonwealth's Brief at 51. The interpretation of the Pennsylvania Rules of Appellate Procedure is a question of law, and thus the "standard of review is *de novo* and our scope of review is plenary." **See**

---

[9] The certified record transmitted to this Court does not include a separate document memorializing the PCRA court's oral order. **See generally Brandschain v. Lieberman**, 466 A.2d 1035, 1036 n.1 (Pa. Super. 1983).

***Barrick v. Holy Spirit Hosp. of Sisters of Christian Charity***, 32 A.3d 800, 808 (Pa. Super. 2011) (*en banc*).

The Commonwealth argues that there was a breakdown in court operations because it failed to receive notice of the PCRA court's Rule 1925(b) order. Commonwealth's Brief at 52. The Commonwealth contends that "it discovered the existence of the [Rule 1925(b)] order only when conducted a periodic audit of the dockets of pending Commonwealth appeals on December 5, 2018." ***Id.*** The Commonwealth states that it "promptly filed" its Rule 1925(b) statement the next day, along with a "petition explaining its lack of notice of the order and its request that the PCRA court treat the petition as timely filed." ***Id.*** The Commonwealth notes that the PCRA court did not rule on the petition and did not mention the petition in its Rule 1925(a) opinion. ***Id.*** Alternatively, the Commonwealth argues that because the PCRA court prepared a Rule 1925(a) opinion addressing the issues, we may consider the appeal. ***Id.*** at 53 (citing, *inter alia*, ***Commonwealth v. Grohowski***, 980 A.2d 113 (Pa. Super. 2009)).[10]

_____

[10] Appellee counters that Rule 1925(b) is a bright-line rule that must be strictly construed. Appellee's Brief at 10-11. Appellee does not directly contradict the Commonwealth's assertion of a breakdown in court operations, but notes that the Commonwealth "had never extended *nunc pro tunc* courtesy to opposing counsel." ***Id.*** at 11. In its Rule 1925(a) opinion, the PCRA court notes that the Commonwealth's appeal should be dismissed because it failed to timely file a court-ordered Rule 1925(b) statement. PCRA Ct. Op. at 11. The PCRA court states that the Commonwealth never requested an extension of time, but does not discuss the Commonwealth's

*(Footnote Continued Next Page)*

- 19 -

In *Grohowski*, the Commonwealth appealed, and Appellee cross-appealed, and both filed untimely court-ordered Rule 1925(b) statements.[11] *Grohowski*, 980 A.2d at 114. In resolving whether to accept the Commonwealth's untimely Rule 1925(b) statement, the *Grohowski* Court observed as follows:

> Rule 1925(c)(3)[12] allows for remand "if an appellant" in a criminal case was ordered to file a statement and did not do so. There is no requirement set forth in the Rule that the appealing party must be the **defendant** in order to apply the Rule. Furthermore, we refuse to read such a requirement into the Rule. Fairness and consistency require that each side be treated the same so that if we are to permit the late filing of the 1925(b) statement for one of the parties, *i.e.*, the Defendant, we must permit the late filing of the 1925(b) statement for the other side, *i.e.*, the Commonwealth.

*(Footnote Continued)* ─────────────

petition to accept its Rule 1925(b) statement as untimely because the Commonwealth lacked notice. *Id.* at 11-12.

[11] In *Grohowski*, the defendant was convicted of narcotics offenses. *Grohowski*, 980 A.2d at 114. Before he was sentenced, the defendant filed, and the trial court granted, a motion for extraordinary relief requesting a new trial. *Id.*

[12] Rule 1925(c)(3) provides as follows:

> If an appellant represented by counsel in a criminal case was ordered to file a Statement and failed to do so or filed an untimely Statement, such that the appellate court is convinced that counsel has been *per se* ineffective, and the trial court did not file an opinion, the appellate court may remand for appointment of new counsel, the filing of a Statement *nunc pro tunc*, and the preparation and filing of an opinion by the judge.

Pa.R.A.P. 1925(c)(3).

*Id.* at 115 (emphasis added). Based on this reasoning, the ***Grohowski*** Court permitted "the late filing of a 1925(b) statement" by the Commonwealth. ***Id.***

Turning to the instant case, the Commonwealth similarly filed an untimely Rule 1925(b) statement. ***See id.*** We need not address whether the Commonwealth lacked notice of the PCRA court's Rule 1925(b) order. Because this Court has permitted the late filing of Rule 1925(b) statements by counseled defendants, we must also permit the Commonwealth's late filing of its Rule 1925(b) statement, particularly since the PCRA court addressed the merits in its Rule 1925(a) opinion. ***See id.*** Accordingly, we decline the PCRA court's and Appellee's request that we dismiss the Commonwealth's appeal. ***See id.***

## Commonwealth's Appeal

We now turn to the Commonwealth's sole issue on appeal:

Did the PCRA court err in granting a new trial absent any showing of deficient representation by trial counsel or prejudice, where, among other factors precluding relief, the record refuted [Appellee's] allegations that counsel failed to investigate [Appellee's] mental health before trial, where [Appellee] and his family had opposed any delay of the trial and concealed his mental health issues for that reason, and where he was found competent to stand trial and was thus unentitled to a continuance in any event?

Commonwealth's Brief at 4.

We summarize the Commonwealth's third argument in support of its sole issue, which raises seven reasons why Appellee failed to establish trial

counsel's ineffectiveness. *Id.* at 36. The Commonwealth's sixth reason is that Appellee could not establish prejudice because (1) the trial court was not willing to continue the trial unless Appellee was incompetent, (2) Appellee and his family were opposed to any delay of trial, and (3) Appellee failed to testify at the PCRA hearing. *Id.* at 45-48.

In relevant part, Appellee counters that trial counsel's failure to timely investigate his mental competency caused prejudice. Appellee's Brief at 15. First, Appellee argues he "could not meaningfully participate in his defense." *Id.* at 15. Appellee asserts that trial counsel admitted on the record that he "could not reveal the exact problem" because of privilege but testified he "had significant cognitive problems which prevented him from his meaningful participation in his case." *Id.* In support, Appellee quotes from trial counsel's testimony at the PCRA hearing:

> [PCRA counsel]. But the fundamental, this is what I'm trying to get to, [trial counsel], was that it was your intention all along to present him and you waited until the very end. But was it his mental condition and the way he was carrying himself and whatnot that made the decision for you, or at least your recommendation to him, because he was, in your opinion, because of his condition unable to be an effective witness?
>
> [Trial counsel]. If he had improved to the point where he was similar to where he was before the trial, I would have called him to the stand. I would have recommended that he testified.

*Id.* at 16 (quoting N.T. PCRA Hr'g, 5/23/16, at 34-35).

Second, because Appellee was not competent, Appellee argues he could not have knowingly waived his right to testify. *Id.* Appellee highlights

- 22 -

that trial counsel "did not even colloquy" him about his mental illness or whether he was taking medication, which in Appellee's view, establishes trial counsel's "lack of knowledge regarding the significance of his ability and necessity of his testimony." *Id.* at 17.

The PCRA court's January 22, 2019 Rule 1925(b) opinion reasoned as follows in granting relief to Appellee:

> Although much of the argument and testimony at the evidentiary hearing revolved around Appellee's competency to stand trial, Appellee contends in the instant PCRA that Appellee's trial counsel was ineffective for a failure to conduct an adequate investigation, and that Appellee was prejudiced as a result. Appellee avers that had trial counsel conducted more face-to-face meetings prior to trial, interviewed Appellee's parents, or worked to obtain documents related to Appellee's mental state, counsel would have been aware of his deteriorating mental state and thus could have requested a continuance prior to trial. This Court agrees with such contention.

PCRA Ct. Op., 1/22/19, at 13. The PCRA court noted that "in the period between Appellee's release from involuntary commitment leading up to the trial, [trial counsel] never contacted Appellee during this critical period . . . ."[13] *Id.* at 14. The PCRA court concluded that Appellee's ineffectiveness

---

[13] The PCRA court pointed out that Appellee's father "called [trial] counsel to inform him of the commitment the week that the commitment occurred," and Appellee's mother corroborated the call. PCRA Ct. Op. at 14. In the PCRA court's view, upon receiving that call, trial counsel should have, but "failed to conduct the necessary pre-trial investigation." *Id.* "Despite this, [trial] counsel testified that his first knowledge of Appellee's commitment came on the second day of trial." *Id.* The PCRA court did not expressly address the credibility of trial counsel's testimony.

*(Footnote Continued Next Page)*

claim had arguable merit, trial counsel had no reasonable basis for his inaction, and summarily reasoned that but for trial counsel's error, there was a reasonable probability of a different outcome:

> Moreover, Appellee was prejudiced by counsel's failure to adequately investigate Appellee's mental state in the month leading up to the trial. Prejudice in a PCRA petition, under a claim of ineffective assistance of counsel requires a showing that there exists a reasonable probability that but for counsel's errors the result of the proceeding would have been different. **Commonwealth v. Mallory**, 941 A.2d 686, 699 (Pa. 2008). A claim of self-defense requires a criminal defendant to show "(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." **Commonwealth v. Mouzon**, 53 A.3d 738, 740 (Pa. 2012). The most critical witness that would allow the jury to properly

_(Footnote Continued)_ ───────────────

The PCRA court agreed with Appellee's contention that "a continuance should have been requested in order to either reevaluate his defense strategy, or to allow Appellee to stabilize." *Id.* Although trial counsel questioned Appellee's father as to whether Appellee could stand trial, the PCRA court held "this is simply not enough," given that Appellee's claim of self-defense would require "the jury to determine Appellee's state of mind . . . ." *Id.* The PCRA court opined that trial counsel "should have interviewed Appellee and [his] parents, and worked to obtain proof of Appellee's deteriorating mental health . . . ." *Id.* The PCRA court maintained that trial counsel's "lack of investigation" severely hampered counsel's options. *Id.* "An adequate investigation," the PCRA court reasoned, "could have given [trial] counsel an ability to reevaluate his planned defense, and potentially present a different defense." *Id.* The PCRA court stated that "earlier in person contact" from trial counsel would have led to the discovery of Appellee's mental state "at a time when counsel could have addressed [that] mental state more appropriately." *Id.* at 15. The PCRA court faults trial counsel for not being in greater contact with Appellee. *Id.*

evaluate whether the defendant reasonably believed that he or she was in reasonable danger is the defendant him or herself.

*Id.* at 15-16.

The standard of review for an order granting a PCRA petition is well-settled:

When reviewing an order granting PCRA relief, we must determine whether the decision of the PCRA court is supported by the evidence of record and is free of legal error. Moreover, we will not disturb the findings of the PCRA court unless those findings have no support in the certified record.

*Commonwealth v. Rivera*, 154 A.3d 370, 377 (Pa. Super. 2017) (*en banc*) (citations omitted and formatting altered).

It is well-settled that to establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.* (citation omitted). Framed differently, a "reasonable probability is a probability sufficient to

undermine confidence in the outcome." ***Commonwealth v. Johnson***, 139 A.3d 1257, 1284 (Pa. 2016) (citation omitted).

In ***Commonwealth v. Puskar***, 951 A.2d 267 (Pa. 2008), the defendant argued that trial counsel was ineffective for not conducting "an adequate investigation into potential mitigating evidence . . . ." ***Puskar***, 951 A.2d at 284. As a result, the defendant claimed his waiver of the presentation of mitigating evidence at the penalty phase was not knowing and voluntary. ***Id.*** at 289-90. The Commonwealth argued, *inter alia*, that the defendant never testified at the PCRA hearing, and therefore, "did not attempt to prove that the outcome of the waiver would have been different if only counsel" had presented the defendant with mitigating evidence. ***Id.*** at 290.

In affirming the denial of PCRA relief, the ***Puskar*** Court reasoned, among other things, that the defendant

> did not testify at the PCRA hearing and thus he did not attempt to establish that, if only counsel had undertaken an investigation of mitigation evidence, he would have relented and permitted counsel to present a case in mitigation. In short, he has not shown that the outcome of his waiver of mitigation would have been different but for counsel's inaction.

***Id.*** at 292; ***see also Commonwealth v. Mitchell***, 105 A.3d 1257, 1273 (Pa. 2014) (affirming denial of PCRA relief because the defendant, who did not testify at the PCRA hearing, "presented no testimony or evidence at the PCRA hearing indicating trial counsel advised [the defendant] that, if he pled

guilty, absolutely no evidence of the sexual offenses would be presented to the jury during the guilt or penalty phases.").

Turning to the instant case, we focus on the prejudice prong, that is, whether the instant PCRA court erred by holding that Appellee established prejudice. **See, e.g.**, **Turetsky**, 925 A.2d at 880. To briefly reiterate, as set forth above, Appellee reasons trial counsel's failure to **timely** investigate prejudiced him for two reasons: (1) he "could not meaningfully participate in his defense," and (2) could not knowingly waive his right to testify. Appellee's Brief at 15-16.

Initially, we question whether a timely investigation of Appellee's mental competency would have resulted in the prejudice that Appellee sets forth above. **See** Appellee's Brief at 15-16. First, as the **Dodds** Court stated on direct appeal, Appellee was deemed competent to stand trial on the first day of trial, and he could not establish a subsequent change in behavior such that he was not competent to stand trial. **See Dodds**, 2014 WL 10558255 at *4. Second, and similarly, the **Dodds** Court noted that Appellee knowingly and intelligently waived his right to testify. **See id.** It follows that if Appellee was competent to stand trial and waive his right to testify, then a timely pretrial investigation into Appellee's mental competency would not establish the prejudice alleged by Appellee in the instant appeal. **See id.**

Moreover, as the PCRA court noted in its Rule 1925(a) opinion, a month or two prior to trial, Appellee telephoned trial counsel in an agitated state, which prompted trial counsel to contact Appellee's Father. PCRA Ct. Op. at 7. Appellee's father assured trial counsel that Appellee was "fine" but just "stressed" because of the upcoming trial. *Id.* Subsequently, two weeks before trial, trial counsel spoke with Appellee and Appellee's family and, according to trial counsel, Appellee appeared "normal" and there was no indication that Appellee was not competent. *Id.* Trial counsel's affirmative action also appears to undermine Appellee's contention of an inadequate timely investigation into Appellee's competency. *Id.*

Additionally, identical to the defendant in *Puskar*, Appellee also failed to testify at the PCRA hearing. *See Puskar*, 951 A.2d at 292. Appellee did not present any testimony or evidence establishing a reasonable probability that the outcome of the trial would have been different if counsel had timely investigated his mental competency. *See id.* Like the defendant in *Mitchell*, Appellee did not present any testimony or evidence at the PCRA hearing that would have established a reasonable probability sufficient to undermine confidence in the verdict. *See Mitchell*, 105 A.3d at 1273; *see Johnson*, 139 A.3d at 1284. Indeed, although the PCRA court found prejudice in a few perfunctory sentences, it completely failed to cite anything of record supporting its prejudice analysis. *See* PCRA Ct. Op. at 15-16.

While the PCRA court asserts that trial counsel's earlier investigation would have permitted trial counsel to investigate alternative defenses, the PCRA court did not state what those defenses would be that could have led to a different outcome. **See** PCRA Ct. Op. at 15-16. For these reasons, because the PCRA court's reasoning lacks any support in the certified record, we reverse the order below. **See Rivera**, 154 A.3d at 377.[14]

Order reversed.

Judge McLaughlin joins the memorandum.

Judge Lazarus files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/20

---

[14] In light of our disposition, we do not have to address the Commonwealth's remaining arguments. **Cf. Commonwealth v. Merchant**, 595 A.2d 1135, 1139 (Pa. 1991) (holding that when reversing on one issue, there is no reason to address the remaining issues); **In re D.A.**, 801 A.2d 614, 618 (Pa. Super. 2002) (same).