J-S31039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JIMMY LEE WILSON | : | |
| | : | |
| Appellant | : | No. 363 EDA 2022 |

Appeal from the PCRA Order Entered December 30, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003317-2013

BEFORE: BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED OCTOBER 17, 2022**

Appellant Jimmy Lee Wilson appeals from the order of the Court of Common Pleas of Bucks County denying his first petition pursuant to the Post-Conviction Relief Act (PCRA).[1] Appellant raises two allegations of ineffective assistance of his trial counsel. After careful review, we affirm.

This Court summarized the factual background of this case on direct appeal:

> This matter arises from a home invasion that occurred in Levittown, Bucks County. [Appellant] planned to burglarize the home of Thomas and Kecia Hall because he believed there would be a significant amount of cash in the house due to Mr. Hall's involvement in football pools. [Appellant] convinced his co-conspirator, Kalyn Walker (Walker), to help him execute the robbery. Prior to this, Walker did not know anything about the Hall family, except for a familiarity with Mr. Hall's identity. During trial, it was discovered that [Appellant's] father and Mrs. Hall were

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

distant cousins and that [Appellant] had been to the Halls' home for family barbeques.

On the night of Saturday, February 23, 2013, Walker picked up [Appellant] in his white Crown Victoria. [Appellant] gave Walker a black drawstring bag containing rope as well as .45 semi-automatic pistol. Upon arriving at the Hall residence, [Appellant] and Walker parked down the street. Walker entered the residence while [Appellant] waited in the car.

Meanwhile, Turquoise Hall, the Halls' then seventeen year-old daughter, was home alone. Around 10:30 p.m., Turquoise heard a knock at the front door. When she opened the door she saw Walker, who was dressed in black and was wearing a black half-mask while holding a gun. Walker told Turquoise not to scream and that it was "OK." As Turquoise backed up, Walker entered the residence.

Once inside, Walker instructed Turquoise to show him her parents' bedroom. Walker proceeded to search the bedroom, but was unsuccessful in finding any money. Shortly thereafter, Mr. and Mrs. Hall returned home. Walker instructed Turquoise to act normally while Walker hid in the kitchen.

The Halls entered their home and proceeded to walk into the kitchen, where Walker was hiding. Upon encountering each other, Walker pointed his gun at Mrs. Hall, told her to get on the floor, and demanded that everyone empty their pockets. Walker then ordered Mrs. Hall to bind Turquoise's hands and then had Mr. Hall bind Mrs. Hall's hands with the same rope. Walker led the mother and daughter into the bathroom.

Walker then took Mr. Hall into the Halls' bedroom and demanded $10,000.00. Mr. Hall explained that he did not have that amount of cash in the residence. Walker searched the bedroom once more while continuously pointing his gun at Mr. Hall. Satisfied there was no cash, Walker instructed Mr. Hall to untie his shoes and bind his own hands.

Walker then stated that on the following Monday at 5:30 p.m., Mr. Hall better have $10,000.00 or he was going to kill Mrs. Hall and Turquoise. Walker instructed Mr. Hall to drop the money in a black bag in a dumpster at the Levittown Trace apartments in Bristol Township. Before leaving, Walker reminded Mr. Hall that his wife and kids "were gonna get it," if he did not have the money.

Because Walker instructed Mr. Hall not to the call the police, he did not do so immediately out of fear for his family.

On the morning of Monday, February 25, 2013, Walker and [Appellant] went to a WaWa store to purchase a phone card so that Walker could use his disposable flip-phone. [Appellant] and Walker then decided to change the plan and called Mr. Hall to inform him that the drop-off time was now 12:00 p.m.

Following this call, Mr. Hall went to Wal–Mart to obtain a black bag. He also went to the credit union to get a hundred dollars in denominations of one-dollar bills. Mr. Hall planned on putting the cash in the black bag and dropping it at the dumpster. Thereafter, he met up with his cousin and the two of them drove towards Levittown Trace apartments.

Because Mr. Hall did not make the 12:00 p.m. drop-off, [Appellant] and Walker decided to increase the amount of money demanded. They informed Mr. Hall via text message that the amount had increased to $15,000.00. Upon receiving this text, Mr. Hall notified the police. While Mr. Hall was giving his statement, he continued to receive calls and text messages from [Appellant] and Walker, which grew increasingly menacing as the day went on. Between 4:30 p.m. and 5:00 p.m., Mr. Hall received two text messages, typed by [Appellant], which stated: "[ ... ] If you don't make it, just hide your kids. I will go to one of the college[s] tonight. I got a picture of all four of your kids. And I'm not waiting until tomorrow, so get that money," and "Fuck it. I'm gonna put you through hell. You going to wish you paid that money." N.T. Trial, 9/30/13, at 189–90.

Shortly thereafter, Mr. Hall, accompanied by several officers of the Bristol Township Police Department, went to the Levittown Trace apartments and put the black bag in the dumpster. A few minutes later, [Appellant] and Walker arrived in Walker's white Crown Victoria and parked in the parking lot across the street. Walker exited the vehicle and scanned the parking lot. Walker observed a plainclothes police officer and, believing him to be a security guard; Walker and [Appellant] left the lot and drove into the back of the Levittown Trace apartment complex. Walker parked and exited the vehicle, while [Appellant] remained inside. Walker then approached the dumpster and retrieved the black bag. At that point, the police intercepted and arrested Walker. Another officer arrested [Appellant] immediately thereafter.

*Commonwealth v. Wilson*, 232 EDA 2014, 2015 WL 7587154 (Pa.Super. February 2, 2015) (unpublished memorandum).

Appellant proceeded to a jury trial at which his co-defendant Walker testified against him. On October 4, 2013, the jury convicted Appellant of five counts of criminal conspiracy, and one count each of attempted theft by extortion, criminal use of a communication facility, and terroristic threats. On October 31, 2013, the trial court sentenced Appellant to an aggregate term of twelve to thirty-seven years' imprisonment.

On November 12, 2013, Appellant filed a timely post-sentence motion. After a hearing, the trial court granted Appellant's post-sentence motion in part by amending his sentence for attempted theft by extortion to be six months' to five years' imprisonment. As a result, Appellant received an aggregate sentence of eleven to thirty-seven years' imprisonment. On February 2, 2015, this Court affirmed the judgment of sentence.

On January 27, 2016, Appellant filed a timely PCRA petition. The PCRA court appointed counsel, who filed an amended petition on June 15, 2018 and a second amended petition on September 24, 2020. The PCRA court encountered significant delay in scheduling a hearing as a result of multiple defense requests for new counsel to be appointed, continuance requests from both parties, and the judicial emergency declared in March 2020 as a result of the COVID-19 pandemic.

On December 30, 2021, the PCRA court issued an order and opinion denying Appellant's PCRA petition and outlining its rationale for doing so. On

January 27, 2022, Appellant filed a timely notice of appeal. Appellant complied with the trial court's directions to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

A. Did the PCRA Court err and commit an abuse of discretion when it failed to hold that trial counsel was ineffective for failing to identify and present an exculpatory witness during Appellant's 2013 trial[?] Did the PCRA Court further err by basing its credibility determination, in no small part, upon the gap in time between Appellant's trial and Appellant's PCRA proceedings?

B. Did the PCRA Court err when it failed to find that trial counsel was ineffective for failing to object to the Trial Court permitting jurors to have transcripts of the proceedings in the jury room with them during deliberations?

Appellant's Brief, at 5.

In reviewing the denial of a PCRA petition, our standard of review is well-established:

[o]ur review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. **Commonwealth v. Cox**, 636 Pa. 603, 146 A.3d 221, 226 n.9 (2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. **Commonwealth v. Burton**, 638 Pa. 687, 158 A.3d 618, 627 n.13 (2017).

**Commonwealth v. Small**, 647 Pa. 423, 440–41, 189 A.3d 961, 971 (2018).

Appellant raises two claims of trial counsel's ineffectiveness. Our review of an ineffectiveness claim is guided by the following principles:

[a]s originally established by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, [104

S.Ct. 2052, 80 L.Ed.2d 674] (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.

*Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009).

*Commonwealth v. Selenski*, 228 A.3d 8, 15 (Pa.Super. 2020).

Appellant first asserts that trial counsel was ineffective for failing to present the testimony of his cousin, Kaswanna Valentine, at trial. With respect to claims of ineffectiveness based on counsel's failure to call a witness, our courts have provided the following:

In establishing whether defense counsel was ineffective for failing to call witnesses, appellant must prove: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Treiber*, 632 Pa. 449, 498, 121 A.3d 435, 463–64 (2015) (quoting *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 277 (2008) (citation omitted)).

To provide context for Appellant's claim, we note that the prosecution presented evidence at trial that Walker received two phone calls on February 23, 2013 (the night of the home invasion), at approximately 9:01 p.m. and

9:53 p.m., from a phone registered to Appellant's mother. The prosecution offered this evidence to support an inference that Appellant used his mother's phone to make these calls to Walker.

In November 2018, five years after Appellant was convicted in this case, Ms. Valentine submitted a written statement indicating that she made two phone calls to Walker from Appellant's mother's phone on the night of February 23, 2013, in an attempt to get a ride from Walker. Appellant contends that Ms. Valentine's testimony would cast doubt on the prosecution's theory that Appellant was the user of the phone that was in contact with Walker the night of the home invasion.

While the PCRA court did not take issue with Ms. Valentine's testimony that she was available to testify at Appellant's trial, the PCRA court did not find Ms. Valentine credible when she testified that she spoke to counsel at trial about her possible testimony. The PCRA court credited trial counsel's testimony that he had no recollection of any witness informing him that the witness had been the user of the phone that was in contact with Walker the night of the home invasion. Notes of Testimony (N.T.), 3/15/19, at 19-20. Thus, Appellant failed to show counsel was aware of or should have known of Ms. Valentine's existence and the substance of her proposed testimony.

Even if counsel had known about Ms. Valentine's testimony, we note that the PCRA court made a specific finding that Ms. Valentine did not appear to be a credible witness. The PCRA court pointed to the following exchange at the PCRA hearing:

[Prosecutor:] And your testimony today is that you called Kalyn Walker on February 23, 2013?

[Ms. Valentine:] Yes.

[Prosecutor:] Is that correct?

[Ms. Valentine:] Yes.

[Prosecutor:] That was the night that you know this robbery happened, right?

[Ms. Valentine:] No, I'm not sure.

[Prosecutor:] You don't know?

[Ms. Valentine:] I don't know the date it happened.

[Prosecutor:] Well, you were there for the trial, right?

[Ms. Valentine:] Yes, but I don't remember the exact date?

[Prosecutor:] But you do remember now specifically that on February 23rd you called Kalyn Walker?

[Ms. Valentine:] I know that I called him that night, but I don't know if that's the night that the robbery happened.

*Id*. at 79-80.

The trial court found it suspicious that Ms. Valentine submitted a written statement in November 2018 in which she recalled the exact date of a random phone call she made to Walker on February 23, 2013, five years earlier while admitting that she had never made any prior documentation of this purported cell phone call. The trial court was skeptical of Ms. Valentine's claim that she did not know that February 23, 2013 was the night that the home invasion occurred, as Ms. Valentine was present for the presentation of evidence at Appellant's trial. We observe Ms. Valentine also acknowledged that she visited her cousin, Appellant, in prison and spoke to him numerous times on the

phone prior to her testimony at the PCRA hearing. *Id*. at 98. Ms. Valentine admitted that she did not want Appellant to remain in jail. *Id*. at 93. [2]

Given that the trial court's decision to disbelieve Ms. Valentine's testimony is supported by the record, we decline to disturb the PCRA court's credibility determinations, which are binding on appeal. **See Small**, **supra**.

Further, we agree with the trial court's assessment that Appellant failed to show the absence of Ms. Valentine's testimony resulted in prejudice. In order to prove the prejudice prong of the ineffectiveness analysis, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." **Selenski**, 228 A.3d at 16 (quoting **Commonwealth v. Spotz**, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted)).

The record contains overwhelming evidence to show Appellant and Walker planned and executed the home invasion and threats to extort the Hall family. As noted above, the phone that was used to contact Walker on the night of the home invasion belonged to Appellant's mother. The prosecution presented evidence that this phone number was also used to make numerous

_____

[2] In addition, we also note that had counsel called Ms. Valentine as a witness, the prosecution would have been able to impeach Ms. Valentine's testimony with the fact that she was Appellant's family member and wanted to see him exonerated and also with the fact that Ms. Valentine had *crimen falsi* convictions.

calls and messages to Walker in the months before the home invasion and was saved in Walker's phone under the name "Wood," which was Appellant's nickname. N.T., 10/2/13, at 45. In some of those messages, the caller demonstrated planning of a "lick," which is a slang word for a robbery. N.T., 10/1/13, at 107-113. Ms. Valentine did not take responsibility for those messages or calls and denied calling Walker on any other occasion before the night of February 23, 2013.N.T., 3/15/19, at 84-85.

The PCRA court emphasized that Appellant's co-conspirator, Walker, confessed to the home invasion and extortion scheme, testified for the prosecution, and directly implicated Appellant in the crimes at issue. While the defense claimed that Walker acted alone, Appellant ignores the fact that both Appellant and Walker arrived together at the ransom drop in Walker's vehicle and Appellant was observed standing on his toes by the dumpster where the money transfer was to occur. N.T., 10/3/13, at 51-65.

Walker also testified that the two men purchased a phone card for a disposable phone which they planned to use to call and message the victims to arrange the ransom drop. This claim is corroborated by video surveillance footage from a local WaWa showing Appellant and Walker purchasing the phone card. N.T., 10/1/13, at 243-45.

Moreover, the ransom messages sent by the perpetrators contained a level of knowledge detailing the victims' personal information about their family, home, and finances. *Id*. at 189. Walker testified that Appellant was a

distant relative of the victims and had been a guest in their home, whereas Walker did not know the victims. *Id*. at 129, 214, 218.

Thus, we conclude that Appellant has not shown he was prejudiced by counsel's failure to present Ms. Valentine as a witness as her testimony was not so crucial as to discredit Walker's testimony and the Commonwealth's evidence that clearly showed Walker and Appellant had conspired to commit the home invasion and attempted extortion of the Hall family. As a result, the PCRA court correctly rejected this ineffectiveness claim.

Second, Appellant claims the PCRA court erred in refusing to find counsel ineffective for failing to object to the trial court's decision to allow the jury to have one of the prosecution's evidentiary exhibits in the deliberation room. The exhibit in question is the transcript created by the prosecution to assist the jury in following the audio recorded telephone call between Walker and the victim. Upon the jury's request, the trial court allowed the jurors to take the transcript of the phone conversation back to the deliberation room.

This Court has held that "[t]he determination as to whether an exhibit should be permitted to go out with the jury during deliberations "is within the sound discretion of the trial judge, and such decision will not be overturned absent an abuse of discretion." ***Commonwealth v. Farkas***, 276 A.3d 814, 819 (Pa.Super. 2022) (quoting ***Commonwealth v. Parker***, 104 A.3d 17, 25 (Pa.Super. 2014) (citations omitted).

Our rules of criminal procedure generally provide that "[u]pon retiring[,] the jury may take with it such exhibits as the trial judge deems proper."

- 11 -

Pa.R.Crim.P. 646(A). However, the rules of criminal procedure outline a small class of items that the jurors are prohibited from having in their possession during deliberations, which include:

(1) a transcript of any trial testimony;

(2) a copy of any written or otherwise recorded confession by the defendant;

(3) a copy of the information or indictment; and

(4) except as provided in paragraph (B), written jury instructions.

Pa.R.Crim.P. 646(C).

In **Commonwealth v. Bango**, 560 Pa. 84, 742 A.2d 1070 (1999), our Supreme Court concluded that the trial court did not abuse its discretion in allowing the jury to review transcripts of audio-recorded conversations presented at trial during its deliberations. The Supreme Court expressly found that the transcripts of the conversations did not constitute "trial testimony" or fall into any of the categories of items prohibited in the deliberation room pursuant to the predecessor of Rule 646 (Pa.R.Crim.P. 1114).

The Supreme Court further explained in **Bango** that "it is permissible for jurors to review transcripts of tapes so long as a limiting instruction is issued and the person responsible for the transcription can be cross-examined with the opportunity for an alternative transcription to be presented by the defendant." **Bango**, 560 Pa. at 90, 742 A.2d at 1073. In that case, the Supreme Court found the trial court had given adequate precautions to the jury in instructing them that the transcripts were not evidence, but rather the

audio-recorded conversations were the evidence to be considered. ***Id***. at 88, 742 A.2d at 1072.

In this case, the trial court rejected Appellant's assertion that the transcripts of the phone conversations constituted "trial testimony" that jurors were prohibited from taking into the deliberation room pursuant to Rule 646(C)(1). Rather, the trial court characterized the transcript as a trial aid designed to assist the jury when listening to the prosecution's exhibit. Thus, the trial court found it permissible to allow the jurors to view the transcript in the deliberation room pursuant to ***Bango***.

On appeal, Appellant failed to cite to any support for his bare assertion that the transcripts of the audio-recorded conversations constituted "trial testimony" as defined in Rule 646(c)(1). Instead, Appellant now argues that trial counsel was ineffective in failing to ask the trial court to issue limiting instructions to inform the jury how to properly consider the transcript.

The trial court asks this Court to find this specific claim to be waived as Appellant did not argue before the PCRA court that trial counsel was ineffective in failing to request a limiting instruction before allowing the jury to take the transcripts to the deliberation room, but instead proceeded under an erroneous theory that Rule 646 prohibited the jury from taking the transcripts into the deliberation room. Trial Court Opinion (T.C.O.), 12/30/11, at 11 (citing ***Commonwealth v. Santiago***, 579 Pa. 46, 62, 855 A.2d 682, 691 (Pa. 2004) ("we have stressed that a claim not raised in a PCRA petition cannot be raised for the first time on appeal").

Regardless of whether this specific issue is waived, we conclude that Appellant's ineffectiveness claim does not entitle him to relief. We acknowledge that the trial court did not instruct the jury that the transcripts were not evidence, but rather the audio-recorded conversations were the evidence to be considered.

However, we agree with the PCRA court's assessment that, given the weight of the evidence presented by the prosecution showing Appellant's guilt, Appellant has not shown that there is a "reasonable probability that the outcome of the proceeding would have been different" if counsel had asked for a limiting instruction to inform the jury on how the transcript should be considered as an aid and not evidence itself. **See Selenski**, **supra**.

Yet again, Appellant fails to acknowledge the overwhelming evidence presented that directly implicated him in the planning and execution of the crimes at issue. While we need not reiterate in detail all of the prosecution's evidence, we emphasize that there was ample physical evidence presented at trial to corroborate Walker's testimony that the men conspired to commit the invasion of the Hall residence and to attempt to extort the victims by making threats of violence against their family. As such, we conclude that Appellant is not entitled to relief on this claim of ineffectiveness.

For the foregoing reasons, we affirm the PCRA court's order denying Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/17/2022</u>